TAX INCREMENT FINANCING COM-
MISSION OF KANSAS CITY,
Missouri, Respondent,

v.

J.E. DUNN CONSTRUCTION CO.,
INC., Appellant.

No. 71318.

Supreme Court of Missouri,
En Banc.

Dec. 12, 1989.

Paul G. Schepers, William J. Burrell, Kansas City, for appellant.

Michael T. White, Paul E. Vardeman, Aaron G. March, Mark F. Brady, Kansas City, for respondent.

William L. Webster, Atty. Gen., John W. Simon, Asst. Atty. Gen., Jefferson City, for amicus curiae, State of Mo.

Paul E. Martin, Asst. City Counselor, James J. Wilson, City Counselor, St. Louis, for amicus curiae, St. Louis City.

John J. Charron, Richard L. McLennan, St. Louis, for amicus curiae, City of Eureka.

ROBERTSON, Judge.

Appellant J.E. Dunn Construction Company ("Dunn") challenges the constitutionality of the Missouri Real Property Tax Increment Allocation Redevelopment Act, Sections 99.800 to 99.865, RSMo 1986 ("the Act"). The trial court upheld the constitutionality of the Act, ordered Dunn's property condemned, and awarded Dunn damages. Because Dunn questions the constitutionality of the Act, we have original appellate jurisdiction. Mo. Const. art. V, § 3. The judgment is affirmed.

## I.

### A.

The Act permits a municipality to create a tax increment financing commission, the actions of which are subject to the final approval of the governing body of the municipality. Section 99.820(11).[1] The Commission may adopt a redevelopment plan, the purpose of which is "to reduce or eliminate those conditions, the existence of which qualified the redevelopment project area as a blighted area, conservation area, economic development area, or combination thereof, and to thereby enhance the tax bases of the taxing districts" within the project area. Section 99.805(8). The plan must set forth in writing, among other things, details as to estimated redevelopment project costs, and the source and nature of the funds to finance such costs. In addition, the plan must provide an estimate of the equalized assessed valuation after redevelopment and the general end uses to apply in the redevelopment project area. No plan may be adopted without the municipality finding, among other things, that the redevelopment project area is a blighted area or a conservation area as defined in Section 99.805 and that the area is neither subject to, nor is it reasonably anticipated that it will be subject to growth through investment by the private sector. Section 99.810.

The Act empowers a municipality to acquire real property "reasonably necessary to achieve the objectives of the redevelopment plan and project" by eminent domain and to convey to private ownership the real property obtained through the condemnation process in order to effectuate the redevelopment plan. Section 99.820(3). The acquisition of real property is a permitted "redevelopment project cost." Section 99.805(11)(c). To provide funding for the acquisition of property and other permitted project costs, a municipality is authorized to issue "[o]bligations secured by the special allocation fund ... for the redevelopment project area ... to provide for redevelopment project costs." Section 99.835.1. The Act contemplates that improvements in the district will result in an increased assessed valuation of the property within the redevelopment area. Thus, each year that the post-plan assessed value of the taxable real property within the redevelopment project area exceeds the pre-plan assessed value, taxes on the *increase* in assessed value are abated. In place of taxes, the taxpayer makes payments in lieu of taxes (PILOTS). The PILOT is equal to the amount of tax that would have been collected on the increased assessed valuation of the property after improvements. The PILOTS are paid into the special allocation fund which is pledged as security for the bonds issued by the municipality. Section 99.835.1.

Surplus funds in the special allocation fund are distributed annually to the taxing districts in the redevelopment project area. Ad valorem taxes collected on the pre-plan assessed value of the project property are paid to the respective taxing districts. When the bonds are retired, the entirety of the post-plan assessed valuation of the property is "levied, collected, and distributed in the manner applicable in the absence of the adoption of tax increment financing." Section 99.850(2).

### B.

The City of Kansas City, Missouri (the "City"), created its Tax Increment Financing Commission (the "Commission") by ordinance on November 24, 1982. The property in dispute in this case is part of a tax

---

1. Unless otherwise noted, all statutory references are to RSMo 1986.

increment financing district (the "District") designated in the Tenth and Troost Tax Increment Finance Plan (the "Plan") adopted by the Commission on November 14, 1986. The entire District is composed of 57,750 square feet of property. The Plan calls for the rehabilitation of two existing buildings and the construction of a new structure within the District, all for office/warehouse uses. The Plan provides, and the City authorized, the issuance of $85,000 in bonds. To date $35,000 of these bonds have been sold, the proceeds from the sale of which were deposited into the general revenue of the Commission for the purpose of underwriting the project costs.

Specifically, this case involves a 7,500 square foot parcel within the redevelopment project area. The property supports a building occupying the entire parcel. Dunn owns the real property at issue and uses it as a dry storage warehouse. No other property owner within the District challenges the constitutionality of the Act nor the Commission's authority to act thereunder.

Pursuant to the Plan, which contemplated the acquisition of appellant's property, the Commission filed its petition to condemn on May 6, 1988. The trial court held a hearing, ordered Dunn's property condemned and appointed three condemnation commissioners to determine the fair market value of Dunn's property. The commissioners filed a report, awarding $55,000 to Dunn. Both the Commission and Dunn filed exceptions. The trial court heard evidence on the exceptions, entered judgment for the Commission, and awarded $58,500 as damages to Dunn. The court also considered and rejected Dunn's motion to dismiss founded on the constitutional challenges now before us.[2] This appeal followed.

## II.

Dunn raises a number points on appeal, the majority of which challenge the constitutionality of the Act. Discussion of Dunn's specific attacks follows in due course. In considering the constitutionality of acts of the General Assembly generally, however, we are reminded that such legislation is presumed constitutional. *State ex rel. Missouri State Board of Registration for Healing Arts v. Southworth*, 704 S.W.2d 219, 223 (Mo. banc 1986).

### A.

Dunn first argues that PILOTS are taxes and that Mo. Const. art. X, § 22(a) "requires increases in government revenues and expenditures to be approved by a vote of the people affected by the increase." Art. X, § 22(a) provides in pertinent part:

Counties and other political subdivisions are hereby prohibited from levying any tax, license or fees, not authorized by law, ... or from increasing the current levy of an existing tax, license or fees, above that current levy authorized by law or charter when this section is adopted without the approval of the required majority of the qualified voters of that ... political subdivision voting thereon.

■ If Dunn's argument proceeds from the premise that the City cannot impose the existing tax levy on the District property without voter approval, the argument must fail. First, it makes no difference to the resolution of this point whether PILOTS are taxes as Dunn contends, or not. The Constitution does not prohibit a city from levying an existing tax without voter approval; instead, it prohibits a city from increasing the current levy of an existing tax without voter approval. It is the tax levy against which the constitution's prohibition is measured, not the tax itself.

■ Second, Dunn does not argue, nor could it on this record, that the City has increased its tax levy. Indeed, the record shows that the PILOTS at issue are the product of the application of the current levy to increased assessed valuations. The

---

**2.** The Act establishes a variety of strict procedural requirements. Appellant in this case does not challenge the Commission's adherence to these statutorily mandated procedural requirements in any respect. Instead, Dunn's challenge is limited to the authority of the Commission to proceed based on the Act's alleged unconstitutionality.

evidence does not show any change in the tax levy.

■ Perhaps Dunn's argument is directed at that portion of art. X, § 22(a) requiring a political subdivision to reduce its tax levy if "the assessed valuation of property as finally equalized, excluding the value of new construction and improvements, increases by a larger percentage than the increase in the general price level from the previous year...." If this is Dunn's argument, the record is devoid of any evidence that the total ad valorem tax revenues of any of the political subdivisions levying a tax over the District's property increased by a larger percentage than the increase in the general price level for the previous year.[3] There is, therefore, no factual basis upon which to consider Dunn's claim.

The point is denied.

### B.

Dunn next contends that the Act allows for a non-uniform levy and assessment of taxes in violation of Mo. Const. art. X, §§ 3 and 4(b) and creates an arbitrary classification for tax purposes in violation of the equal protection guarantees of Mo. Const. art. I, § 2 and U.S. Const. amend. XIV.

### 1.

■ In relevant part, art. X, § 3 states: "Taxes may be levied and collected for public purposes only, and shall be uniform upon the same class or subclass of subjects within the territorial limits of the authority levying the tax." Section 99.850.3 directs that "[n]othing in sections 99.800 to 99.865 shall be construed as relieving property in such project areas from paying a uniform rate of taxes, as required by article X, § 3 of the Missouri Constitution."

Dunn argues that other taxing authorities levying taxes against District property will face increased costs during the life of the Plan. Dunn tells us those taxing authorities "will be required to increase the taxes or fees they assess and levy for their purposes. As a result, property owners outside the Project Area carry more than their fair share of the general costs of government, which creates a non-uniform scheme of taxation."

Dunn's argument finds no evidentiary support in the record and ignores the directives of the Act. District property is subject to the same tax levy as property not within the District. It is the application of the existing tax levy to the improvements that creates the tax increment used to fund repayment of the bonds. The levy is, therefore, uniform.

### 2.

■ Even if the levy is uniform, Dunn persists, the assessment of taxes is not uniform and violates both art. X, § 3 and art. X, § 4(b). The latter requires that property "shall be assessed ... at its value or such percentage of its value as may be fixed by law...." Again, Dunn misunderstands the requirements of the Act. Section 99.855.2 requires that "all tax levies ... be extended to the current equalized assessed value of all property in the redevelopment project area in the same manner as the tax rate percentage is extended to all other taxable property in the taxing district." On its face, the Act requires compliance with the mandates of the Constitution. There is no evidence in this record that the assessment of District property is contrary to either the requirements of the Act or the Constitution.

### 3.

In reality, Dunn's argument is that the uses anticipated for the PILOTS violate the Constitution. Even if one assumes that PILOTS are tax revenues, art. X, § 3 requires that taxes collected be expended for public purposes; beyond that limitation, art. X, § 3 does not control the distribution or allocation to which tax receipts may be put.

---

3. Under the language of art. X., § 22, it is at least arguable, though we do not decide the question today, that increased ad valorem tax revenues generated by new construction and improvements in the District are excluded altogether from the total revenue calculation for purposes of levy reduction.

"The power to classify for tax purposes is primarily in the legislature and not in the courts, ..." *Barhorst v. City of St. Louis,* 423 S.W.2d 843, 846 (Mo. banc 1967). Consistent with this broad power, "[t]he legislature is squarely authorized to grant tax relief ..." under Mo. Const. art. X, § 7. *State ex rel. Atkinson v. Planned Industrial Expansion Authority,* 517 S.W.2d 36, 46 (Mo. banc 1975).

> "For ... the reconstruction, redevelopment and rehabilitation of obsolete, decadent or blighted areas, the general assembly ... may provide for such partial relief from taxation of the lands devoted to any such purpose ... upon such terms, conditions, and restrictions as it may prescribe."

*Id.* By its clear terms, the Constitution permits the General Assembly to provide partial tax relief; included within that power is the authority to redirect the revenues attributable to improvements for the purposes enumerated in art. X, § 7. The PILOTS are the General Assembly's mechanism for addressing the problems of blight, obsolescence and decay, particularly within, though not limited to, the urban setting here. The Act is consistent with the Constitution.

There being no denial of uniformity either as to tax levies or property assessment within the District, Dunn's point is denied.

### III.

Mo. Const. art. VI, § 26(a) prohibits political subdivisions from incurring indebtedness in excess of "the income and revenue provided for such year plus any unencumbered balances from previous years" except as permitted by the Constitution. Mo. Const. art. VI, § 26(b) permits political subdivisions to incur debt not greater than five percent of the value of its taxable tangible property upon the approval of two-thirds of its qualified voters.

Dunn next argues that the bonds contemplated by the Plan may not be issued without voter approval. The Commission concedes that the voters did not approve these bonds. Because there has been no voter approval, Dunn contends the bonds were not issued in a manner consistent with the requirements of the Constitution and, therefore, its property cannot be acquired with the proceeds of the bond sale.

Here we must face squarely Dunn's contention that PILOTS are taxes. The Court's precedents are clear on this point; if PILOTS are taxes, art. VI, § 26(b) applies and the voters must approve the bonds prior to their issue.

In *Leggett v. Missouri State Life Insurance Co.,* 342 S.W.2d 833, 875 (Mo. banc 1960), the Court defined "taxes" as the " 'proportional contributions imposed by the state upon individuals for the support of government and for all public needs.' [Citations omitted]. Taxes are not payments for a special privilege or a special service rendered. [Citations omitted]. Fees or charges prescribed by law to be paid ... for services rendered in connection with a specific purpose ordinarily are not taxes, [citations omitted], unless the object of the requirement is to raise revenue to be paid into the general fund of the government to defray customary governmental expenditures...." Accord *Craig v. City of Macon,* 543 S.W.2d 772, 774 (Mo. banc 1976).

Dunn's argument is founded on the assumption that the adoption of art. X, § 22(a) changed the definition of taxes in Missouri. In support of its point, Dunn focuses on the broad definition of "tax, license or fees", art. X, § 22(a), given that phrase in *Roberts v. McNary,* 636 S.W.2d 332 (Mo. banc 1982).

In *Roberts,* the Court confronted the need to define "tax, license and fees", a phrase not found in our law prior to the adoption of art. X, § 22(a). Dunn relies heavily on *Roberts'* understanding of the breadth of the constitutional phrase. "Reading the words examined here [tax, license and fees] for their ordinary and customary meanings, they present a sweeping list of the types of pecuniary charges a government makes." 636 S.W.2d at 336. But "tax" bears a more narrow meaning than "tax, license and fees". This pericope

is thus not conducive to defining the more narrow word "tax", at issue here.

Dunn then directs us to *Roberts'* use of the dictionary to define "tax" as "a pecuniary charge imposed by legislative or other public authority upon persons or property for public purposes: a forced contribution of wealth to meet the public needs of a government." 636 S.W.2d at 335, quoting Webster's Third New International Dictionary 2345 (1965). Contrary to Dunn's assertion, *Roberts* is not inconsistent with *Leggett*. Indeed, *Roberts* quotes *Leggett* as authority, relying on that case to define "tax" within the phrase "tax, license or fees".

■ *Leggett* teaches, and *Roberts* agrees, that an exaction demanded by the government for a special privilege or for specific purposes and not intended to be paid into the general fund to defray general public needs or governmental expenditures is not a tax.

■ The Act directs that PILOTS be paid into a special allocation fund securing the bonds. The bonds finance special purpose improvements to the District. PILOTS are not initially available for deposit into the general fund of the taxing districts; only after meeting debt service on the bonds may any surplus be used to meet general governmental expenditures in the special allocation fund. Section 99.835.1. In sum, PILOTS are not taxes.[4]

As the Commission argues, PILOTS are special assessments levied against the property in the District for the improvements provided that property under a redevelopment plan. See *County of Fresno v. Malmstrom*, 94 Cal.App.3d 974, 156 Cal. Rptr. 777, 782 (1979) ("Special assessments are not general taxes but rather used to confer special benefit upon the parcels charged for the improvements.") The fact that the PILOTS are measured by the assessed value of the property does not change their character as special assessments. See *State ex rel. Webster Groves Sanitary Sewer District v. Smith*, 115 S.W.2d 816, 822 (Mo. banc 1938) (Assessments may be expressed as proportion of the assessed valuation of the property.)

■ Having concluded that PILOTS are special assessments, not taxes, we now consider whether the bonds are subject to art. VI, § 26(b). "We must ask … whether revenues from the taxpaying public can be used to retire bonds under the act." *State ex rel. Atkinson v. Planned Industrial Expansion Authority*, 517 S.W.2d 36, 48 (Mo. banc 1975).

Section 99.835.3 states: "Obligations issued pursuant to [the Act] … are special obligations of the municipality payable solely from the special allocation fund…." By its clear terms, the Act protects the taxpaying public from any liability for funds to retire bonds issued. Moreover, the indebtedness contemplated by the Act falls within the special funds doctrine long recognized by this Court. "The assessments authorized by [the statute] are for the payment of local improvements, denominated special benefits to the land against which the assessments are made; … such assessments do not constitute an indebtedness, within the meaning of the constitutional provision…." *Embree v. Kansas City–Liberty Boulevard Road District*, 166 S.W. 282, 289 (Mo. banc 1914). Accord *Petition of City of St. Louis*, 364 Mo. 700, 266 S.W.2d 753, 755 (1954); *State ex rel. Atkinson v. Planned Industrial Expansion Authority*, 517 S.W.2d 36, 47 (Mo. banc 1975).

For the reasons stated, art. VI, § 26(b) does not apply to bonds issued pursuant to the Act. Dunn's point is denied.

## IV.

Dunn next raises two points challenging the authority of the Commission to acquire its, Dunn's, property.

---

**4.** In another of its points, Dunn argues that the Act authorizes an unconstitutional diversion of tax proceeds for "non-public purposes." If PILOTS are not taxes—and we hold here that they are not—it follows that the Act cannot require an unlawful diversion of taxes. For the reasons stated, we reject Dunn's "non-public purpose" argument as well.

**A.**

Mo. Const. art. I, § 28 states: "That private property shall not be taken for private use with or without compensation ..., the question whether the contemplated use by public shall be judicially determined without regard to any legislative declaration that the use is public." Mo. Const. art. I, § 10 provides: "That no person shall be deprived of life, liberty or property without due process of law." From these constitutional premises, Dunn argues that the use of eminent domain to restore a conservation area as defined by the Act is not a public purpose.

Mo. Const. art. VI, § 21 provides:

Laws may be enacted, and any city or county operating under a constitutional charter may enact ordinances, provided for the clearance, replanning, reconstruction, redevelopment and rehabilitation of blighted, substandard or insanitary areas, and for recreational and other facilities incidental or appurtenant thereto, and for taking or permitting the taking, by eminent domain, of property for such purposes, and when so taken the fee simple title to the property shall vest in the owner, who may sell or otherwise dispose of the property subject to such restrictions as may be deemed in the public interest.

As Dunn notices, the Constitution does not use the phrase "conservation area". Thus, Dunn contends, because the Constitution does not use that phrase, the powers of eminent domain granted by art. VI, § 21 do not apply.

We find no Missouri case defining the meaning of "substandard" within art. VI, § 21. The word carries a commonly understood meaning as it relates to structures: "deficient in amenities (as sanitary accommodations, living space, safety facilities, or maintenance) in respect to a standard set by legal or other authoritative sources." Webster's Third New International Dictionary 2279–80 (1965).

■■■■ Section 99.805(2) defines a "conservation area" as

any improved area within the boundaries of a redevelopment project area located within the territorial limits of a municipality in which fifty percent or more of the structures in the area have an age of thirty-five years or more. Such an area is not yet a blighted area but is detrimental to the public health, safety, morals, or welfare and may become a blighted area because of any one or more of the following factors: Dilapidation; obsolescence; deterioration; illegal use of individual structures; presence of structures below minimum code standards; abandonment; excessive vacancies; overcrowding of structures and community facilities; lack of ventilation, light or sanitary facilities; inadequate utilities; excessive land coverage; deleterious land use or layout; depreciation of physical maintenance; and lack of community planning.

And read in the context of art. VI, § 21, "substandard" speaks to a power given certain political subdivisions to prevent, as well as eliminate, incipient conditions of blight. We believe, therefore, that an area designated a "conservation area" is substandard for purposes of art. VI, § 21. It follows that eminent domain power extends to the condemnation of land within a conservation district, if the property is taken for a public purpose.

■■■ Dunn claims that the use to which the land in the District will be put is not a public purpose. We disagree.

"It is common knowledge that one of the results of the nineteenth century beginning of the transformation of our country from a predominantly agricultural to a predominantly industrial society has been the growth like 'Topsy' of our great cities. Within the last thirty years we have awakened to the realization that a result of the growth has been the creation of slums and blighted areas therein constituting a serious and growing menace injurious to the public health, safety, morals and welfare of their inhabitants as well as the depreciation in value of properties within and adjacent to those areas, and a consequent progressive diminution of tax revenues. Prompted by the need to eliminate these conditions as a breeding ground for juvenile delinquency, infant mortality, crime and disease,

most, if not all, states have vested their municipalities with power to eradicate those conditions and redevelop those areas...."

*Annbar Associates v. West Side Redevelopment Corp.*, 397 S.W.2d 635, 639 (Mo. banc 1965).

In concluding that an area is a conservation area, the municipality must first find that conditions in the area are "detrimental to the public health, safety, morals or welfare and may become a blighted area...." Section 99.805(2). This Court has held that art. I, § 28 and art. VI, § 21 must be considered together and

> mean that final determination of the question whether the contemplated use ... is public rests upon the courts, but that a legislative finding under said law that a blighted [, substandard] or insanitary area exists ... will be accepted by the courts as conclusive evidence that the contemplated use thereof is public, unless it further appears by allegation and clear proof that the legislative finding was arbitrary or was induced by fraud, collusion or bad faith.

*State ex inf. Dalton v. Land Clearance for Redevelopment Authority*, 364 Mo. 974, 270 S.W.2d 44, 52 (1954).

Dunn neither alleges nor proves that the City Council's finding that the District is a conservation area is arbitrary or the product of fraud, collusion or bad faith. The City's finding is, therefore, conclusive. The point is denied.

## V.

■ Mo. Const. art. VI, § 23 states: "No county, city, or other political corporation or subdivision of the state shall ... lend its credit or grant public money or thing of value to or in aid of any corporation, association or individual, except as provided in this constitution."

Mo. Const. art. VI, § 25 erects a similar barrier to the ability of a political subdivision to lend its credit for private purposes.

Dunn argues that the City has loaned its credit by issuing the bonds in this case. We disagree for two reasons.

First, the credit of the City "is the power to levy general taxes. When it pledges all or part of that power, it pledges its cred-

it...." *Richards v. Muscatine*, 237 N.W.2d 48, 65 (Iowa 1975). No such credit has been extended here. Bonds issued under the Act are not general obligation bonds; the City has not pledged its full faith and credit, has not obligated its general fund, and has not placed the taxpayers at risk to secure the bondholders. The Act expressly and without equivocation designates these bonds as "special obligations of the municipality payable solely from the special allocation fund." Section 99.835.3. Second,

> [T]here is no lending of credit where, as here, revenue bonds are paid solely ... from the project and not from taxes. Moreover, ... the purpose of the constitutional prohibition against the lending of credit is to prohibit the state from acting as a surety or guarantor of the debt of another. As in [*State ex rel. Mitchell v. City of*] *Sikeston*, [555 S.W.2d 281 (Mo. banc 1977)], neither the Authority nor any city or county guarantees the payments of the bonds.

*State ex rel. Jardon v. Industrial Development Authority of Jasper County*, 570 S.W.2d 666, 676 (Mo. banc 1978). The point is denied.

## VI.

Mo. Const. art. X, § 2 states: "The power to tax shall not be surrendered, suspended or contracted away, except as authorized by this constitution." In its penultimate point, Dunn argues that the City "has attempted to delegate to the [Commission] indirectly a power of taxation that the City itself does not possess, in violation of [art. X, § 2]." In essence, Dunn's argument is that the City is permitted to divert tax revenues needed by other taxing authorities to its own uses.

The force of the argument obviously depends on PILOTS being taxes. We conclude otherwise, supra. The point is denied.

## VII.

■ Finally, Dunn argues that Mo. Const. art. VI, § 27 requires voter approval

prior to the issuance and sale of revenue bonds. Absent voter approval, Dunn continues, the Commission may not acquire Dunn's property with the proceeds of the "unlawful" bonds.

On the same day the voters approved art. VI, § 27, they also approved Mo. Const. art. VI, §§ 27(a) & (b). In a quo warranto action designed to determine which if any of the amendments became part of the Constitution, this Court held that the amendments were not irreconcilably in conflict and that both became part of the Constitution. *State ex inf. Ashcroft v. City of Fulton*, 642 S.W.2d 617 (Mo. banc 1982).

The constitutional provision upon which Dunn relies grants political subdivisions authority to issue revenue bonds upon voter approval for three purposes: utility plants, manufacturing plants and industrial development purposes, and airports. Art. VI, § 27(b), however, permits "[a]ny ... city ... by a majority vote of the governing body thereof ..." to issue and sell revenue bonds to pay, inter alia, the costs of acquiring real estate for commercial and warehouse purposes. Art. VI, § 27 does not apply in this case; because the Plan contemplates the commercial and warehouse development, art. VI, § 27(b) controls and the City may issue its bonds lawfully upon approval of its governing body. The record shows that the City Council of Kansas City approved the issuance and sale of these bonds. Dunn's final point is without merit.

#### VIII.

The judgment of the trial court is affirmed.

BLACKMAR, C.J., RENDLEN, HIGGINS, COVINGTON, BILLINGS, JJ., and CARL R. GAERTNER, Special Judge, concur.

HOLSTEIN, J., not participating because not a member of the Court when the case was submitted.