CENTENE PLAZA
REDEVELOPMENT CORPORATION,
Respondent,

v.

MINT PROPERTIES,
et al., Appellants.

No. SC 88487.

Supreme Court of Missouri,
En Banc.

June 12, 2007.

Gerard T. Carmody, Kevin M. Cushing, Teresa Dale Pupillo, Carmody MacDonald, P.C., St. Louis, MO, for Appellants.

Thomas B. Weaver, James E. Mello, Jeffery T. McPherson, Timothy J. Tryniecki, Jovita M. Foster, Armstrong Teasdale, LLP, St. Louis, MO, for Respondent.

Kevin M. O'Keefe, Paul Martin, Clayton, MO, City of Clayton, for Amicus Curiae.

Patricia A. Hageman, City of St. Louis Counselor, Patricia Redington, St. Louis County Counselor, Michael A. Gross, Counsel for MO Municipal League, St. Louis, MO, Albert A. Riederer, Jackson County Special Counselor, Kansas City, MO, Missouri Municipal League, City of St. Louis, Missouri, Jackson County, Missouri and St. Louis County, Missouri, for Amicus Curiae.

PER CURIAM.[1]

### Overview

The city of Clayton solicited redevelopment plans for one block of Forsyth Boulevard. Centene Plaza Redevelopment Corporation submitted the plan approved by Clayton, which included condemnation authority. When Centene failed to reach agreement with all the property owners to acquire the properties, it filed this condemnation action. Mint Properties and several other defendants resisted the condemnation on the basis that the property was not blighted, as defined by section 353.020, RSMo 2000. The trial court found in favor of Centene. Because the finding of blight was not supported by substantial evidence, the judgment is reversed.

### Development of the plan

Centene purchased property located at 7700 Forsyth and 21 Hanley with the intent to expand its current office and parking space. Centene also sought to purchase a garage owned by the city adjacent

---

1. The Court of Appeals, Eastern District, transferred this case to this Court by per curiam opinion. *Mo. Const. article V, section*

10. Parts of that opinion are incorporated without further attribution.

to Centene's current office building. During discussions about purchasing the garage, Centene discovered that the city was seeking redevelopment of the area.

The city subsequently issued a general request seeking proposals from developers to redevelop the entire block of Forsyth bordered by South Bemiston Avenue, Hanley Road, and Carondelet Avenue. Centene submitted the only response to the request for proposals. Centene proposed a three-phase project that included formation of a redevelopment corporation, tax abatement, and the power of eminent domain.

The city reviewed Centene's response and then commissioned Peckham, Guyton, Albers, & Viets ("PGAV") to conduct an analysis of the area to determine whether it qualified as a blighted area. PGAV's analysis ultimately concluded that the property qualified as a blighted area.

The city subsequently passed an ordinance declaring the area to be blighted and approving Centene's plan. The area included defendants' properties. After approval of the plan, Centene sought to acquire the affected properties. When these efforts failed, condemnation actions were filed.

## Standard of review

This Court examines the record to determine whether there is substantial evidence to support the legislative decision. *Binger v. City of Independence*, 588 S.W.2d 481, 486 (Mo. banc 1979).

## Blight requires a showing of "social liability"

Section 353.020 sets forth the definition of "blighted area." A blighted area consists of those portions of the city that "by reason of age, obsolescence, inadequate or outmoded design or physical deterioration have become economic *and* social liabilities, and that such conditions are conducive to ill health, transmission of disease, crime or inability to pay reasonable taxes...." (Emphasis added.) Centene concedes that the determination of blight must include findings that the area in question is both an economic liability and a social liability.

Although the term "social liability" is not specifically defined by statute or in case law, the historical context suggests the definition of "social liability" focuses upon the health, safety, and welfare of the public. In that regard, it has been noted that the transformation of this country from primarily agricultural to a predominantly industrial society resulted in significant growth in the cities. *Tax Increment Financing Com'n of Kansas City v. J.E. Dunn Const. Co., Inc.*, 781 S.W.2d 70, 78 (Mo. banc 1989). One result of this growth was blighted areas, which constituted a "menace injurious to the public health, safety, morals and welfare" of the residents. *Id.* The blighted areas also presented economic concerns. *Id.* The need to eliminate these conditions as a "breeding ground for juvenile delinquency, infant mortality, crime and disease" prompted a movement toward redevelopment. *Id.*

## The evidence of social liability was insufficient[2]

■ Based on the foregoing definition of "social liability," the evidence was insuffi-

---

2. After Centene filed actions for condemnation of the properties, the legislature enacted section 523.261, RSMo Supp.2006. The statute states that with regard to condemnation actions, "any legislative determination that an area is blighted, substandard, or unsanitary shall not be arbitrary or capricious or induced by fraud, collusion, or bad faith and

cient. In particular, the evidence before the city concerning fire, police, and emergency services reports did not support a conclusion of social liability. Michael Schoedel, the city manager, testified that he requested information from the Clayton fire and police departments regarding the calls in the area. A memorandum from Mark Thorp, the fire chief, indicated that from 2001 to 2006, there were no fire calls and no emergency services calls at all for most of the properties in the redevelopment area, and collectively, there were only four fire calls and two emergency responses for eight properties in the area over the course of five years.

Tom Burn, the chief of police, also submitted a memorandum to Schoedel, indicating the number of police calls to the properties in the redevelopment area dating back to 1999. There were a total of 143 calls for five properties over approximately seven years, but this was less than half the number of calls for a single property located across the street during that time frame.

Although Schoedel expressed some potential concerns regarding safety, crime, fire hazards, and vandalism due to vacancies in the area, the information he received from the fire and police departments did not validate these concerns. In addition, there was no evidence presented regarding any public health concerns resulting from the condition of the area.

According to Schoedel, the PGAV blighting study commissioned by the city was a critical component in the city's determination of blight. However, while the PGAV study did conclude that the area was an economic liability because of the age, obsolescence, inadequate or outmoded design, and physical deterioration of some of the properties, it did not make any conclusions regarding the social liability of the area. Moreover, the PGAV study did not find that any of these conditions were injurious to the public health or safety. In fact, John Brancaglione, PGAV's employee, testified that the factors existent in the area did not constitute a social liability in the way he "understood that to be applicable to these situations." Instead, Brancaglione testified that the area was a social liability only to the extent that it constituted an economic liability because of its inability to pay reasonable taxes. Nevertheless, Centene argues that the blighting study prepared by PGAV was not the only factor in the city's determination of blight. However, as noted, Schoedel specifically testified that the PGAV study was a critical component in the determination of blight.

Centene also claims that the determination of blight was supported by substantial evidence by citing the increase in jobs the redevelopment would provide and the "vibrant," pedestrian-friendly atmosphere that would result from the redevelopment. However, this evidence focuses only upon the prospective benefits of redevelopment—not the current state of the properties themselves. The city's ultimate goals for the area cannot serve as probative evidence of social liability in light of the lack of evidence concerning the public health, safety, and welfare in the record. Furthermore, if evidence to support a find-

shall be supported by substantial evidence." Prior to section 523.261, the standard of review of the legislative determination was that it must not be arbitrary or induced by fraud, collusion or bad faith. *Crestwood Commons Redevelopment Corp. v. 66 Drive–In*, 812 S.W.2d 903, 910 (Mo.App.1991). If the ac-

tion of the legislative body was "reasonably doubtful or even fairly debatable," the court could not substitute its judgment for that of the legislative body. It is not necessary to determine if section 523.261 applies retroactively because Clayton's determination of blight failed to meet either standard.

ing of economic liability could also constitute evidence to support a finding of social liability, the plain language of section 353.020 would be defeated.

■ Finally, while under section 353.020(1), an "area" may include buildings that are not themselves blighted, but which are deemed necessary for the redevelopment, there is a lack of evidence of social liability as to any portion of the area sought to be condemned. The area, therefore, failed to meet the statutory definition of "blighted area."[3]

### Conclusion

The judgment is reversed.

WOLFF, C.J., TEITELMAN, LIMBAUGH and RUSSELL, JJ., concur.

STITH, J., concurs in separate opinion filed.

LYNCH, Sp.J., concurs in opinion of STITH, J.

WHITE, J., dissents in separate opinion filed.

PRICE, J., not participating.

LAURA DENVIR STITH, Judge, concurring.

I concur in the result reached by the principal opinion but do not fully agree with its analysis or that argued by Appellants for determining what constitutes a social liability.

Appellants' argument in this Court focuses on the fact that Clayton is a vibrant, economically successful community with many desirable business, retail, and residential neighborhoods within it. This does not fit with the popular perception of what constitutes a blighted neighborhood, to wit, an area that is rundown and located in a marginal community, one that offers little attraction to businesses and, thus, must resort to incentives, including the opportunity to acquire property by eminent domain, to encourage investment.

All agree that the City of Clayton is not such a marginal or rundown community. Appellants' references to Clayton's general wealth implicitly suggest that a successful community like Clayton simply cannot contain blighted property and that to so find would be inconsistent with what this Court should say constitutes "blight." Admittedly, this argument has a surface appeal; a finding of blight and use of eminent domain to combat blight makes the most sense in communities that have high crime, deteriorated infrastructure, and/or health problems. But, it is not for this Court to create its own definition of "blight" based on what this Court believes is appropriate public policy. Rather, it is our duty to apply the definition of "blight" adopted by the legislature.

Missouri's legislature considered whether to limit the definition of "blight" to such marginalized communities and whether to bar the use of eminent domain as a means of enhancing economic development following the United States Supreme Court's decision in *Kelo v. City of New London*, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d

---

**3.** Article I, section 28 of the Missouri Constitution prohibits the taking of private property for uses that are not public and ensures judicial review of whether the use is public without regard to any legislative declaration that such use is public. These requirements prevent a condemning authority from forcing the transfer of private property from its owner primarily for benefit of another private party. The Court takes no position on whether this development project complies with these constitutional requirements. *See State ex rel. Broadway–Washington Associates, Ltd. v. Manners*, 186 S.W.3d 272, 274, n. 2 (Mo. banc 2006).

439 (2005).[1] In 2006, however, the legislature rejected all attempts to narrow the definition of "blighted area."[2] It was and still is defined as:

> that portion of the city within which the legislative authority of such city determines that by reason of age, obsolescence, inadequate or outmoded design or physical deterioration have become economic and social liabilities, and that such conditions are conducive to ill health, transmission of disease, crime or inability to pay reasonable taxes.

Sec. 353.020(2), RSMo Supp.2006.

This language does not limit the definition of what constitutes a "blighted area" to rundown, marginal communities. Rather, as both parties acknowledged during oral argument, what constitutes blight may vary from community to community. An area of the city that is perfectly acceptable in a more economically distressed community may be considered "blighted" in a city like Clayton because it is out of keeping with the remainder of the community "by reason of age, obsolescence, inadequate or outmoded design or physical deterioration." *Id.* If the local legislative body determines that a particular portion of its city fits this definition and, therefore, has become an "economic and social liability," then it may declare that area a blighted one and permit a qualifying developer to acquire property in that area by eminent domain.

A city acts in its legislative capacity in determining whether an area is blighted, and this Court reviews whether this legislative determination was supported by substantial evidence. *Allright Missouri, Inc. v. Civic Plaza Redevelopment Corp.*, 538 S.W.2d 320, 324 (Mo. banc 1976) (upholding determination of blight because "evi-

---

1. *Kelo* held that the United States Constitution does not prohibit the use of eminent domain for purposes of economic revitalization and that, because the City of New London adhered to Connecticut's statutory scheme in formulating its economic development plan, its use of eminent domain to acquire land for development was not unconstitutional.

2. The legislature did, however, add language governing how this Court is to review a legislative determination of blight. Prior to *Kelo*, Missouri law provided that such a determination must be upheld unless it "was arbitrary or was induced by fraud, collusion or bad faith." *Parking Sys., Inc. v. Kansas City Downtown Redevelopment Corp.*, 518 S.W.2d 11, 15 (Mo.1974). In 2006, the legislature codified this standard and added the requirement that the legislative determination must be supported by substantial evidence. Sec. 523.261, RSMo Supp.2006. As the principal opinion notes, however, this additional language makes no difference to the result in this case. In any event, it is merely a codification of existing case law stating that a legislative determination will be found arbitrary if it is not supported by substantial evidence. *See, e.g., Howlett v. Social Security Comm'n*, 347 Mo. 784, 149 S.W.2d 806, 810 (1941) (explaining that a decision is arbitrary if it "is not based upon substantial evidence"); *JG St. Louis West Ltd. Liab. Co. v. City of Des Peres*, 41 S.W.3d 513, 516–19 (Mo.App. E.D.2001) (approving blighting ordinance that "was not arbitrary, was fairly debatable, and was supported by substantial evidence"); Dale A. Whitman, *Eminent Domain Reform in Missouri: A Legislative Memoir*, 71 Mo. L.Rev. 721, 738 (2006) ("This language would make no discernable change in the standard of review that Missouri courts have been using for more than fifty years. The courts have generally treated the phrases 'not arbitrary and capricious' and 'supported by substantial evidence' as two ways of saying the same thing"). Even if the evidence contrary to the legislative determination seems stronger to the Court than the evidence supporting it, if there is substantial evidence on both sides so that the issue can be said to be "fairly debatable," then the Court must defer to the legislative determination of blight. *JG St. Louis West Ltd. Liab. Co.*, 41 S.W.3d at 518 (because "there were reasonable theories supporting each side's position ... [the] Board's decision as to blighting was fairly debatable" and, thus, the court upheld the Board's decision).

dence on which the City's legislative body made its determination" was fairly debatable).[3] The issue, then, is whether sufficient evidence was presented from which the City of Clayton could have determined that the redevelopment area in this case had become an economic and social liability. Appellants presented evidence that Clayton as a whole is very successful, that the redevelopment area still sustains certain businesses, and that the Library Ltd. property was purchased for a substantial sum twice in the last few years.

Centene, however, presented substantial contrary evidence showing that the redevelopment property is an economic liability. In particular, Centene relied on the PGAV study, which found evidence of age, obsolescence, inadequate and outmoded design and physical deterioration to varying degrees in some of the properties in the redevelopment area. The same study also found that the average annual increase in the assessed value of the properties in the redevelopment area was below that of other properties in the area and that sales tax collections from the properties significantly declined in the last ten years while sales tax collections city-wide remained stable. The PGAV study concluded, and the City apparently agreed, that "the evidence of the extent and distribution of the existence of age, obsolescence, inadequate or outmoded design, and physical deterioration are such that the Area has become an economic liability and demonstrates an inability to pay reasonable taxes."

The principal opinion does not address this evidence of economic liability other than noting its existence. Instead, the principal opinion goes directly to the issue of whether the property is a social liability. The term "social liability" is not defined in Missouri's statutes or in Missouri cases. And although the term is often used in other states' statutes and in articles about redevelopment, neither the parties, the principal opinion, nor this author's independent research has identified an accepted definition of the term.

The principal opinion nonetheless concludes that "the historical context suggests the definition of 'social liability' focuses upon the health, safety, and welfare of the public" because such concerns were the reason that blighted areas have been identified and have led to the application of eminent domain. The trend to providing incentives for economic development may have centered historically on the desire to eliminate conditions that are a "breeding ground for juvenile delinquency, infant mortality, crime and disease." But, whatever may be the merit of these general historical considerations, Missouri's blight statute does not limit a finding of "social liability" to situations in which a portion of a community has so deteriorated that it has become a "breeding ground" for crime and disease.

To the contrary, the statute specifically states that economic and social liabilities, if they exist, are conditions that are "conducive to ill health, transmission of disease, crime or inability to pay reasonable taxes." Sec. 353.020(2). This language is impor-

---

3. This Court's usual standard of review is under *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). This standard "does not apply when the trial court has reviewed the propriety of a decision by an administrative or by a legislative body. In [that] instance we examine the record to determine whether there is substantial evidence to support the legislative decision." *Binger v. City of Independence,* 588 S.W.2d 481, 486 (Mo. banc 1979). *Accord Parking Systems, Inc.,* 518 S.W.2d at 15–17; *JG St. Louis West Ltd. Liab. Co.,* 41 S.W.3d at 517–19; *Crestwood Commons Redevelopment Corp. v. 66 Drive–In,* 812 S.W.2d 903, 910 (Mo.App. E.D.1991).

tant for two reasons. First, it means that an area can be a social liability if it is merely *"conducive to"* crime, ill health, and so forth. In other words, crime and unhealthy conditions need not yet be present; the city can declare blighted an area it believes is conducive to such conditions as a means of avoiding them, and such a declaration is neither arbitrary nor capricious.

Second, an area may constitute an "economic and social liability" if the condition of the area is "conducive to" *either* ill health, crime *"or* an inability to pay reasonable taxes." The statute, as now written, thus plainly permits a social liability to be found based upon considerations that lead to an inability to pay reasonable taxes. A showing that crime or ill health is present, or even likely to develop, is not required. The principal opinion is, thus, incorrect in focusing so strongly on the fact that Clayton has done an admirable job of keeping its city safe and that few crimes or emergency calls occur in the redevelopment area. To the extent the principal opinion suggests that the presence of crime or ill health is necessary in order to find social liability, it confuses the definition of "social liability" and goes beyond the language of the statute.

Nonetheless, I agree that Centene simply failed to present substantial evidence that the area constitutes a social liability. Because the term "social liability" is not defined in the statutes, this Court applies the ordinary meaning of the term as found in the dictionary. *Cook Tractor Co., Inc. v. Dir. of Revenue,* 187 S.W.3d 870, 873 (Mo. banc 2006). The definition of "social" includes "of, relating to, or concerned with the welfare of human beings as members of society" and "of or relating to the interaction of the individual and the group." *Webster's Third New International Dictionary* (1993). "Liability" means "something that works as a disadvantage." *Id.*

Thus, under the plain meaning of the term, "social liability" can be anything that works to the disadvantage of the welfare of members of a given community or of interaction among such members. This is a very broad definition that can be satisfied by any number of circumstances.

The difficulty is that, although the PGAV report quotes the language from section 353.020(2) defining "blight" and, thus, its authors seem to have been aware that social liability is part of the analysis, the entirety of the conclusion, as well as the relevant discussion relating to the specific factors analyzed, focuses on economic liability. While Centene suggests that the absence of the term "social liability" may just have been an oversight, the level of detail and attention given to every other aspect of the statutory definition of "blight" makes the suggestion that a finding of social liability was accidentally omitted and should be "read into" the report rather implausible.

When asked about the issue, the expert witness for Centene testified that the redevelopment area is a social liability because the term is equated with the economic liability when the resulting detriment claimed is, as here, an inability to pay reasonable taxes. The witness explained that he believes the area is "a social liability from the standpoint that it's not generating revenue, and therefore it has a broader impact on the ... municipal revenue sources and how it supports the rest of the City." As he explained it, "every time you find the inability to pay reasonable taxes that also means that you have satisfied the requirements of the statute for a finding of" both social liability and economic liability.

In arguing that an inability to pay reasonable taxes is a social liability, Centene collapses together two separate parts of the statutory definition of "blight." The statute says that a social and economic

liability may be *conducive* to an inability to pay reasonable taxes, not that the two conditions are one and the same. Centene was required to identify a separate social liability that in conjunction with the economic liability led to an inability to pay reasonable taxes. Otherwise, to paraphrase the principal opinion, "if evidence to support a finding of [inability to pay reasonable taxes] could also constitute evidence to support a finding of social liability, the plain language of section 353.020 would be defeated."

It may be that the area is a social liability and that evidence that it is could be presented at some future point. It was not presented on this record, however. For that reason, I concur in the principal opinion's determination to reverse the order of condemnation because substantial evidence did not support the legislative determination that the area constituted a social liability.

RONNIE L. WHITE, Judge, dissenting.

I respectfully dissent. In my view, Centene presented sufficient evidence from which the City of Clayton reasonably could have determined that the redevelopment area had become an "economic and social liability." This phrase demonstrates the legislature's recognition of the causal connection between economics and social welfare. A decline in the former inevitably undermines the latter, and I would interpret the statute as such. Even assuming the two must be evaluated separately, I would adopt Judge Stith's definition of "social liability" but would conclude that the City's finding was supported by enough evidence to withstand this Court's review. Therefore, I would affirm the order of condemnation.