Strafford
No. 89-006

CITY OF DOVER
v.
IMPERIAL CASUALTY & INDEMNITY COMPANY

April 30, 1990

*Scott E. Woodman*, of Dover, for the plaintiff, filed no brief.

*Backus, Meyer & Solomon*, of Manchester (*B J Branch* on the brief and orally), for the defendant.

*Gregoire, Calivas & Morrison*, of Dover (*Chris W. Calivas* on the brief and orally), for the intervenor, Alice Hitchens.

*Burns, Bryant, Hinchey, Cox & Schulte P.A.*, of Dover (*Mark H. Gardner* on the brief), by brief for Michael St. Pierre, as *amicus curiae*.

*Cleveland, Waters and Bass P.A.*, of Concord (*Craig L. Staples* and *Thomas F. Kehr* on the brief), by brief for the New Hampshire Municipal Association—Property Liability Insurance Trust, as *amicus curiae*.

BROCK, C.J. The defendant, the provider of insurance coverage for the plaintiff, argues on appeal that the Superior Court (*Nadeau, J.*) erred in finding that RSA 507-B:2, I, which affords immunity to municipalities for certain actions in negligence, violates the New Hampshire State Constitution. We affirm.

Alice Hitchens claims that she suffered an injury on January 4, 1986, while walking on a sidewalk adjacent to Central Avenue in Dover. According to Mrs. Hitchens, the City of Dover's (City) failure to maintain the sidewalk in a safe condition resulted in the accumulation of "slippery substances." She alleges that she slipped and fell on these substances and was caused to suffer severe and permanent personal injuries, pain and suffering, mental anguish, medical expenses, lost wages and diminished earning capacity. Mrs. Hitchens filed a lawsuit against the City asking for damages as a result of the alleged negligence in maintaining the sidewalk.

The City forwarded a copy of the writ of summons to its liability insurer, Imperial Casualty & Indemnity Company (Imperial), which had issued the City a comprehensive general liability insurance policy. The policy contained several endorsements, one of which excluded coverage for "any injury for which the insured is immune from liability under the provisions of RSA 507-B." Among other things, RSA chapter 507-B provides that municipalities may not be held liable for personal injury arising out of the negligent maintenance of sidewalks. RSA 507-B:2, I. Therefore, Imperial notified Mrs. Hitchens and the City that the alleged injury was not covered by the policy.

The City filed a petition for declaratory judgment claiming that Imperial had a duty to indemnify and defend Mrs. Hitchens' claim. Imperial filed an answer and subsequently submitted a motion for summary judgment with affidavits, claiming that Mrs. Hitchens' injury was excluded by the policy endorsement. The City responded with an answer and cross-motion for summary judgment supported by affidavits, contending that the constitutionality of the statute underlying the endorsement, RSA 507-B:2, I, had been successfully challenged and that the claim was therefore covered under the provisions of the policy.

A hearing was held on December 8, 1988, which resulted in the issuance of a superior court order granting the City's cross-motion for summary judgment. The trial court ruled that the City was not immune from liability and that coverage did exist under the endorsement. The ruling was based on a prior Superior Court (Temple, J.) decision, *Bisson v. Town of Farmington*, No. 86-C-574 (where RSA 507-B:2, I, was held to be unconstitutional), and on *Opinion of the Justices*, 126 N.H. 554, 493 A.2d 1182 (1985) (where language similar to that found in RSA 507-B:2, I, was found not to be "constitutionally justifiable").

On appeal, the defendant contends that the trial court erred in finding that RSA 507-B:2, I, violates the State Constitution. The defendant argues that the limitations on municipal liability are justified and, to the extent that the statute creates classifications of tort claimants, the classifications are reasonable, not arbitrary, and rest upon a ground of difference having a fair and substantial relation to the legitimate object of regulation.

In opposition, Mrs. Hitchens, as intervenor, and Michael St. Pierre, as *amicus curiae*, argue that RSA 507-B:2, I, would deprive them of their right to a remedy as provided in part I, article 14 of the State Constitution. They claim that the classifications created by the statute are not reasonable and violate State constitutional guarantees of equal protection found in part I, articles 2 and 12.

We begin our analysis of these claims with a brief historical review of municipal immunity in New Hampshire. The doctrine of municipal immunity for torts was first created by the judiciary, *see Merrill v. Manchester*, 114 N.H. 722, 727, 332 A.2d 378, 382 (1974), and is generally believed to have originated in England. *See id.* at 724, 332 A.2d at 380. Limits on the liability of municipalities were recognized early in the history of our State, *see Farnum v. Town of Concord*, 2 N.H. 392 (1821), and over time, municipal immunity from tort liability arising out of certain actions in negligence became well-settled law in New Hampshire. *Opinion of the Justices*, 101 N.H. 546, 548, 134 A.2d 279, 280 (1957).

Municipal tort immunity was founded on the principle that "[i]t is better that an individual should sustain an injury than that the public should suffer an inconvenience." *Gossler v. Manchester*, 107 N.H. 310, 312, 221 A.2d 242, 243 (1966) (quoting *Russell v. Men of Devon*, 2 Term Rep. 667, 100 Eng. Rep. 359 (1789)). The legislature, perhaps recognizing the harsh consequences of this principle, enacted statutes mitigating the doctrine under certain circumstances. *See id.* at

313, 221 A.2d at 244 (citing RSA 245:20 (change in grade of highway) (current version at RSA 231:75); RSA 247:17 (bridges, culverts, sluiceways or dangerous embankments) (current version at RSA 231:92); RSA 412:3 (immunity waived to extent of insurance coverage); RSA 247:9, :10 (notice of insufficiency) (current version at RSA 231:90, :91)). The courts also established limits on immunity by holding that municipalities were liable for torts as if they were private corporations when they performed proprietary functions. *Merrill v. Manchester*, 114 N.H. at 725, 332 A.2d at 381. As a result of both legislative and judicial action, no general rule existed by which tort liability of municipalities could be ascertained, and liability had to be determined by a process of elimination. *Gossler v. Manchester*, 107 N.H. at 313, 221 A.2d at 244 (citing *Rhobidas v. Concord*, 70 N.H. 90, 47 A. 82 (1899)).

In *Gossler*, a 1966 case, this court recognized the persuasiveness of arguments supporting the abrogation of governmental immunity. *Gossler v. Manchester*, 107 N.H. at 314, 221 A.2d at 245. However, we declined to overturn the doctrine, stating that "the scope of municipal liability . . . was a matter for legislative rather than judicial determination." *Id.* at 315, 221 A.2d at 245 (citing *Harkinson v. City of Manchester*, 90 N.H. 554, 5 A.2d 721 (1939)). This position was reenforced the following year when then Chief Justice Kenison, while acknowledging his "dim view of governmental immunity," wrote for the majority in holding that "[t]he extent to which . . . immunity should be preserved or waived is purely a legislative question." *Krzysztalowski v. Fortin*, 108 N.H. 187, 189, 230 A.2d 750, 752 (1967) (quoting *Opinion of the Justices*, 101 N.H. at 549, 134 A.2d at 281).

Following the decisions in *Gossler* and *Krzysztalowski*, several legislative initiatives were proposed to further limit the doctrine of municipal immunity. *Merrill v. Manchester*, 114 N.H. at 727, 332 A.2d at 382. None was successfully enacted. *Id.*

In 1974, we were again asked to rule upon the doctrine of municipal immunity for torts. *Merrill v. Manchester*, 114 N.H. 722, 332 A.2d 378. In *Merrill*, we stated that the principle underlying municipal immunity, "[t]hat an individual injured by the negligence of the employees of a municipal corporation should bear his loss himself . . . offends the basic principles of equality of burdens and of elementary justice." *Id.* at 724, 332 A.2d at 380. Further, we stated that the principle is "foreign to the spirit of our constitutional guarantee that every subject is entitled to a legal remedy for injuries he may receive in his person or property." *Id.* at 725, 332 A.2d at 380. We thus con-

cluded that municipalities should be held to the same safety standards as other citizens, *id.* at 728, 332 A.2d at 383, and that they are subject to the same rules of liability as private corporations, *id.* at 730, 332 A.2d at 383.

In *Merrill,* the immunity from tort liability which had been conferred upon municipalities was abrogated, subject to certain exceptions. *Merrill v. Manchester,* 114 N.H. at 729, 332 A.2d at 383. These exceptions provided limited immunity for acts and omissions constituting "(a) the exercise of a legislative or judicial function, and (b) the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion." *Id.* We also ruled that the "legislature has authority to specify the terms and conditions of suit against cities and towns, limit the amount of recovery, or take any other action which in its wisdom it may deem proper." *Id.* at 730, 332 A.2d at 384. In so ruling, the effective date of the abrogation was delayed by approximately six months to permit the legislature to take appropriate action in regard to "social and economic factors." *Id.*

The legislature responded to *Merrill* by enacting RSA chapter 507-B, which was intended to define in a comprehensive manner the exposure of local governmental units to liability. Laws 1975, ch. 483; *Estate of Cargill v. City of Rochester,* 119 N.H. 661, 668, 406 A.2d 704, 708 (1979). RSA 507-B:2 specified when a municipality was liable for negligence and read:

> "507-B:2 Liability for Negligence. A governmental unit may be held liable for damages in an action to recover for bodily injury caused by its fault or by fault attributable to it, arising out of ownership, occupation, maintenance or operation of the following:
> "I. All premises, except public sidewalks, streets, highways or publicly owned airport runways and taxiways.
> "II. All motor vehicles."

This statute was amended to its present form in 1981 when "personal injury or property damage" was inserted following "bodily injury" in the introductory clause. Laws 1981, ch. 376. The constitutionality of RSA 507-B:2 has never been ruled upon by this court.

In 1985, we were asked to render an advisory opinion on the issue of governmental immunity in the context of proposed legislation addressing the sovereign immunity of the State. *See Opinion of the Justices,* 126 N.H. 554, 493 A.2d 1182. One of the provisions consid-

ered at that time by the justices was nearly identical to RSA 507-B:2, I, and would have granted immunity to the State from:

> "Any claim arising out of the ownership, occupation, maintenance, or operation of public sidewalks, streets, highways, or publicly owned airport runways or taxiways."

*Id.* at 565, 493 A.2d at 1190 (citing proposed RSA 541-B:19, I(f)). In opining that the provision was not constitutionally justifiable, the justices stated that:

> "the State's interest in minimizing its liability exposure is adequately served by retention of the State's immunity for injuries caused in the exercise of a legislative, judicial, or planning function, and for intentional torts based on a reasonable belief in the lawfulness of the offensive act. If the legislature wishes to further insulate the State from the consequences of its tortious conduct, it must employ measures that do not purport to reduce the substantive scope of the State's liability."

*Id.* at 565–66, 493 A.2d at 1190.

■ Having conducted this historical review, we conclude that municipal immunity, as a judicially created doctrine, no longer exists. Municipalities continue to enjoy limited protection from tort actions when the injury is the result of the exercise of a legislative or judicial function, or a planning function involving a basic policy decision that is characterized by a high degree of official judgment or discretion. The State may also immunize municipalities and their officials from intentional tort liability when an employee of the municipality has acted under a reasonable belief that his conduct was authorized by law. *See Opinion of the Justices,* 126 N.H. at 564–65, 493 A.2d at 1190. Furthermore, the State may take action to specify the terms and conditions of suit against cities and towns, set reasonable limits on the amount of recovery, or take any other action which in its wisdom it may deem proper, *Merrill v. Manchester,* 114 N.H. at 730, 332 A.2d at 384, so long as those actions are consistent with the State Constitution. *Estate of Cargill v. City of Rochester,* 119 N.H. at 664, 406 A.2d at 705 (quoting *Brown v. Wichita State University,* 219 Kan. 2, 7, 547 P.2d 1015, 1021 (1976)).

■■ We begin our analysis by acknowledging that the right to a legal remedy has a constitutional foundation. The New Hampshire Constitution provides:

"Every subject of this state is entitled to a certain remedy, by having recourse to the laws, for all injuries he may receive in his person, property, or character; to obtain right and justice freely, without being obliged to purchase it; completely, and without any denial; promptly, and without delay; comformably to the laws."

N.H. CONST. pt. 1, art. 14. This provision makes civil remedies readily available and guards against arbitrary and discriminatory infringements on access to the courts. *Estate of Cargill v. City of Rochester*, 119 N.H. at 665, 406 A.2d at 706. However, the right to a remedy is necessarily relative and "does not prohibit all impairments of the right of access." *Id.* The right to recover for one's injuries is not a fundamental right. *Id.* at 667, 406 A.2d at 707.

■ There are legitimate differences between the situations of a municipality and a private party as potential tort defendants. *Estate of Cargill v. City of Rochester*, 119 N.H. at 666, 406 A.2d at 706. These differences may provide unlimited liability for a private tort defendant, see Carson v. Maurer, 120 N.H. 925, 941–43, 424 A.2d 825, 836–38 (1980) (statutory cap on private medical malpractice awards held unconstitutional), while restrictions on the liability of a governmental unit may be justified. *See Estate of Cargill v. City of Rochester*, 119 N.H. 661, 669, 406 A.2d 704, 709 (1979) (statutory cap on municipal tort awards held constitutional). In determining whether municipal liability can be limited, the right of an injured plaintiff to recover must be balanced against the competing interests of the municipality. *Opinion of the Justices*, 126 N.H. at 568, 493 A.2d at 1192.

■ Our constitution also provides for equal protection under the law. *Opinion of the Justices*, 126 N.H. at 559, 493 A.2d at 1186; N.H. CONST. pt. I, arts. 2 and 12. Under equal protection provisions, the right to recover is an important substantive right. *Carson v. Maurer*, 120 N.H. at 931–32, 424 A.2d at 830. Therefore, restrictions on the right are subject to "a more rigorous judicial scrutiny than allowed under the rational basis test." *Id.* at 932, 424 A.2d at 830. Classifications created by legislation which impair the right to recover "must be reasonable, not arbitrary, *and* must rest upon some ground of difference having a fair and substantial relation to the object of the legislation." *Opinion of the Justices*, 126 N.H. at 559, 493 A.2d at 1186 (quoting *Carson v. Maurer*, 120 N.H. at 932, 424 A.2d at 830–31) (further citations omitted).

To determine whether the protection from suit afforded municipalities by RSA 507-B:2, I, is constitutionally sound, we must first understand the objective of the statute. Research of the legislative history has provided us with little insight as to why the legislature created the exception for highways, streets and sidewalks found in RSA 507-B:2, I, and we are reluctant to speculate on its intent. However, the original bill creating RSA chapter 507-B was written in cooperation with the New Hampshire Municipal Association (Association), N.H.S. JOUR. 303 (1975), which has submitted a brief in the present case, as *amicus curiae*. The Association's brief provides some insight into the purpose of the exception:

> "[T]he legislature has recognized the potentially crushing burden which the above responsibility [maintaining 11,939.06 miles of roadway and accompanying sidewalks] may place upon municipalities if liability were allowed in all instances. The human resources clearly do not exist at the local level to conduct daily inspections of roadways in order to determine whether a potentially hazardous pothole or frost heave has developed overnight, whether vandals have destroyed property, or whether some other danger has suddenly arisen. Time, and notification to the municipality of potential highway defects, is essential to ensuring that an absolutely unworkable standard of care will not be imposed upon municipalities.

> "In passing RSA 507-B:2, I, the legislature has also attempted to ensure that municipal coffers will not be depleted by diverting necessary public funds to defend against suits, no matter how groundless, and to satisfy potentially numerous and exorbitant judgments."

Thus, the Association provides two principal reasons why the legislature may have sought to benefit municipalities by legislating immunity from negligence actions arising from the ownership and operation of highways, streets, and sidewalks. First, the cost of defending suits and paying awards may place a burden on the public treasury or may divert funds from other necessary services. Second, the public burden of maintaining the highway system makes it impracticable to hold a town responsible under an ordinary negligence standard.

In considering the first reason, we note that the legislature has already placed financial limits on the tort liability of towns and cities, RSA 507-B:4 (Supp. 1989), and reasonable caps on tort recovery

against municipalities have withstood constitutional challenge. *Estate of Cargill v. City of Rochester,* 119 N.H. at 669, 406 A.2d at 709. Although "[t]he existence of liability insurance does not create a cause of action where none would otherwise exist," *Hartman v. Town of Hooksett,* 125 N.H. 34, 37, 480 A.2d 12, 14 (1984), we acknowledge that the availability of insurance does allow a community to plan for the financial contingencies which may arise from the defense, settlement or award of a negligence suit. In light of the statutory limit on damages and the availability of insurance, we conclude, as we have before, that "[t]he fact a municipality is not a profit-making venture and that it would be improper to divert municipal funds to the payment of tort claims are not convincing arguments in support of municipal immunity." *Merrill v. Manchester,* 114 N.H. at 726, 332 A.2d at 381. A concern for the effect on the public treasury is not, in and of itself, a legitimate justification for depriving injured parties of a remedy against a town or city.

This brings us to the second legislative objective suggested by the Association: that given the responsibility of cities and towns to maintain public highways and sidewalks, it is unworkable to hold them to an ordinary negligence standard. We find that this argument has far more merit. Given the limited financial resources, the land area and the scope of responsibility of local communities, it may be impractical to expect that roads and sidewalks will be routinely patrolled or subject to preventive maintenance. To the contrary, it is more likely that municipalities, particularly smaller towns, will take action on their roads and sidewalks only when a problem is identified or is known to exist. Requiring a town to satisfy an ordinary negligence standard with respect to the ownership and maintenance of highways and sidewalks which are subject to constant and unsupervised public use may unreasonably burden a municipality. We conclude that this objective is a legitimate reason to consider impairment of an individual's right of recovery.

■ Since the purpose of the legislation is legitimate, we now apply the standard which we have established to evaluate whether the statute violates principles of equal protection. We have held that such an analysis requires us to determine whether the classifications created by the statute are reasonable, not arbitrary, and rest upon some ground of difference having a fair and substantial relation to the object of regulation. *Carson v. Maurer,* 120 N.H. at 932, 424 A.2d at 830–31.

RSA 507-B:2, I, provides municipalities with complete immunity from tort liability resulting from negligence incident to ownership or maintenance of highways, streets and sidewalks. This immunity is somewhat limited by a patchwork of exceptions found in other statutes, most of which pre-date the enactment of RSA chapter 507-B. These exceptions impose liability upon municipalities for bridges, culverts, sluiceways and dangerous embankments which are unsuitable for travel. RSA 231:92. They also subject a municipality to liability when it fails to respond to a formal notice, which must be signed and filed by three persons acting in concert, informing the municipality of conditions of disrepair or unsafe travel. RSA 231:90, :91. Further, a municipality must refrain from pleading immunity as a defense to the extent that it has insurance coverage for the claimed liability. RSA 412:3. We are reluctant to categorize the combination of unbridled immunity found in RSA 507-B:2 with these few exceptions as a "statutory scheme." Such a categorization would imply a systematic plan for defining municipal liability. While the harsh consequences of municipal immunity may be limited in some circumstances, the statutory design, whether intended or not, leaves municipal immunity largely unfettered. It is quite possible that a community could know about a hazardous condition existing on a highway or sidewalk which jeopardizes the safety of travelers, have adequate opportunity to correct the problem, and then escape liability to parties injured by simply ignoring the condition or deciding not to take corrective action. Likewise, a town or city, in the course of highway maintenance or construction, can create hazardous conditions and avoid making reparation to those injured by its actions.

We recognize that a statute need not be perfectly tailored to satisfy our heightened standard of review. We also acknowledge that the asserted purpose of RSA 507-B:2, I (the avoidance of burdens which may be imposed on municipalities through the imposition of an ordinary negligence standard) is a legitimate legislative objective. However, this statute and the corresponding limiting statutes create a category of citizens who not only are limited from taking legal action in circumstances of ordinary negligence involving common highway maintenance, but are without remedy even when a municipality creates or is aware of a problem which could result in serious injury and then acts irresponsibly in failing to correct the problem.

The laws of our State should be structured to encourage diligent service on the part of public employees. *See Opinion of the Justices,* 126 N.H. at 564, 493 A.2d at 1189. A statute which rewards intransi-

gence on the part of municipalities or their employees, to the injury of others, should not be condoned.

We hold that RSA 507-B:2, I, is unconstitutional. It creates a category of plaintiffs who are disenfranchised from their right to a remedy simply because the defendant is a municipality. The statute is unreasonably broad, is arbitrary, and does not bear a fair and substantial relation to the legislative objective.

That is not to say that the legislature may not place reasonable limits on the right to recovery. Perhaps the best guidance in this regard can be gained by reviewing the concerns of the Association: "*Time*, and *notification* to the municipality of potential highway defects, is essential to ensuring that an absolutely unworkable standard of care will not be imposed upon municipalities." (Emphasis added.) A statute which is tailored to protect the interests of communities when they have no notice of a problem or when they have inadequate opportunity to respond to a known problem may meet constitutional requirements. But, when a community has actual notice of a hazardous condition on its highways or sidewalks and has had adequate opportunity to correct the condition, protect travelers from injury, or warn public users of the hazard, those injured as a result should not be denied an opportunity to recover.

■ In conclusion, we hold that RSA 507-B:2, I, is not constitutionally justified because it violates equal protection provisions found in part I, articles 2 and 12 of the State Constitution by impermissibly denying parties injured on municipal highways and sidewalks a right to recover as provided in part I, article 14. Although the right of recovery may be limited, RSA 507-B:2, I, provides communities with too broad an exemption from liability for negligence. The statute is arbitrary and does not bear a fair and substantial relation to the object of the legislation.

*Affirmed.*

SOUTER, J., with whom THAYER, J., joined, dissented; the others concurred.

SOUTER, J., dissenting: I respectfully dissent from the court's conclusion that RSA 507-B:2, I, violates articles 2, 12 and 14 of part I of the Constitution of New Hampshire insofar as it would provide municipal immunity for liability arising out of ownership, occupation, and maintenance of "public sidewalks, streets [and] highways. . . ." In explaining why, I will confine my thoughts to what I see as a mis-

application of the accepted middle-tier equal protection standard and say nothing more about article 14, given this court's view that the article mirrors the equal protection standard for scrutinizing limitations on a generally applicable civil right of action, *see Estate of Cargill v. City of Rochester*, 119 N.H. 661, 667, 406 A.2d 704, 707 (1979).

At least since the date of *Carson v. Maurer*, 120 N.H. 925, 424 A.2d 825 (1980), the guarantee of equal protection under articles 2 and 12 has been applied to limitations on rights of civil recovery by recognizing a natural class of all people personally injured by conduct within a recognized category of ostensibly tortious behavior. Leaving aside the special problems that are said to be created by the workers' compensation statute, *see Estabrook v. American Hoist & Derrick, Inc.*, 127 N.H. 162, 183, 498 A.2d 741, 754 (1985) (Souter, J., dissenting), we are supposed to pass on statutory classifications restricting a right to recover for an injury so inflicted by treating the affected cause of action as "an important substantive right," *Carson v. Maurer, supra* at 931–32, 424 A.2d at 830, and by requiring that any classification resulting from a restriction upon such a right "be reasonable, not arbitrary, *and* . . . rest upon some ground of difference having a fair and substantial relation to the object of the legislation. . . . (Emphasis added.) *State v. Scoville*, 113 N.H. 161, 163, 304 A.2d 366, 369 (1973), *quoting F. S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)." *Carson v. Maurer, supra* at 932, 424 A.2d at 831 (further citations omitted).

Middle-tier equal protection scrutiny thus entered the jurisprudence of the State Constitution, *id.*, and accompanying questions as yet unanswered will provide fodder for a good many opinions. I am concerned here, however, with what I see as the misapplication of this intermediate standard, assuming it to be truly intermediate in character and as limited in application as the court in *Carson* indicated by the language used to describe it.

An understanding of that intermediate character and the limits of such review can prove elusive, however, and it is well to acknowledge that *Carson*'s test suffers from a proven susceptibility to confusion with other standards of equal protection review, a failing perhaps portended by the derivation of *Carson*'s language from *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415. *Royster* involved a challenge to disparate State corporate income tax treatments, as to which the latitude of State legislative discretion under the Fourteenth Amendment's equal protection clause was admitted to be "no-

tably wide." *Id.* The majority nonetheless struck down the statute in question because they could "conceive" of "no ground" for justifying the differential treatment, *id.* at 416; Justices Brandeis and Holmes, on the other hand, dissented because they could conceive of just such a ground, *id* at 418. What is clear, however, is that the entire Court treated the test of what was "reasonable, not arbitrary . . . having a fair and substantial relation to the object of the legislation," *id.* at 415, as what we today would call the first-tier, rational basis test. Although the federal judiciary, like this court, has subsequently tried to use *Royster*'s formulation to provide "somewhat heightened" middle-tier scrutiny, *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 441 (1985), the very opinions cited in *Carson* as so applying it have reverted to type, as it were, by lapsing into rational basis terminology. *See, e.g.,* on legitimacy classifications, *Lalli v. Lalli*, 439 U.S. 259, 273 (1978), *cited in Carson v. Maurer, supra* at 932, 424 A.2d at 831 ("our inquiry [is] . . . on whether the statute's relation to the state interests it is intended to promote is so tenuous that it lacks . . . rationality"); and, on gender, *Reed v. Reed*, 404 U.S. 71, 76 (1971) (question "is whether a difference in the sex of competing applicants . . . bears a rational relationship to a state objective. . . ."). This court, indeed, has gone one step further in recognizing candidly that the rational basis test and the test derived from *Royster* have in some instances been treated as interchangeable, *see State v. Deflorio*, 128 N.H. 309, 315, 512 A.2d 1133, 1136 (1986).

At least in our State cases, this proven judicial tendency to blur any difference between the two tests doubtless reflects the further fact that the first segment of the compound standard derived from *Royster* is simply a concise version of the rational basis test, *Carson*'s threshold requirement that a challenged classification be "reasonable, not arbitrary," *see Carson v. Maurer, supra* at 932, 424 A.2d at 831, being equivalent to the usual first-tier standard that the classification must "rationally relate[ ] to a legitimate State interest," *Boehner v. State*, 122 N.H. 79, 84, 441 A.2d 1146, 1149 (1982) (citation omitted). And while the court in *Carson* may or may not have said the last word in seeming to identify rational basis with a favorable cost-benefit balance, *Carson v. Maurer*, 120 N.H. at 933, 424 A.2d at 831, the court did make it clear that this prong of the test was deferential to the legislative judgment in question, "the wisdom of or necessity for" which was beyond the scope of judicial review. *Id.*

Indeed, as the court expressed it at one point, the second-tier test was deferential in its entirety (*i.e.*, in the absence of suspect classi-

fication or fundamental right, courts will not second-guess legislative judgment of need, *id.*). This pledge of deference is a shaky one, however, thanks to uncertainty over the meaning of the second segment of the standard derived from *Royster*, requiring a "fair and substantial" relationship between the chosen classification and the legitimate legislative objective. This uncertainty must be seen as a further condition not only facilitating the identification (or misidentification) of the *Carson* standard with the rational basis test, as we have seen, but also placing temptation in the way of those inclined to impose a far stricter standard in the name of intermediate scrutiny, as we will see below.

While the definitive explanation of "fair and substantial relationship" must apparently await another day, it is fair to say here that if the phrase really is to function as a genuinely middle-tier test, and at the same time defer to ultimate legislative policy judgments, it must be understood as a substantively neutral requirement that the classification in question fit the permitted legislative objective with some minimally acceptable level of precision, or promote it with some like degree of efficiency. It is thus presumably meant to be a test that would strike down a classification barring too many people from invoking a right even when they could do so without compromising the State's objective, and it might also take into consideration a claimant's demonstration that a challenged classification would allow too many to invoke the right even when that would be antithetical to the State's objective. The test, in any event, must be intended to demand that there be some appropriate level of inclusiveness in any classification selected to serve a lawful interest by disparate treatment. On any other view, indeed, the *Carson* test would simply be an obscurely articulated judicial commission for reviewing the merits of legislation, a role that the *Carson* court took pains to disclaim any authority to play in the name of intermediate scrutiny. (Whether *Carson*'s promise of substantively neutral middle-tier review can be a truly practical objective is, of course, another question, which would take me beyond the justifiable scope of a dissent in this case. Here, I am only trying to work with *Carson*'s reasoning taken at face value.)

Assuming, then, that we are to have a distinctly articulated intermediate test of equal protection review, and assuming that I am right about the function that the "fair and substantial" criterion may perform in such review consistently with *Carson*'s reasoning, the task confronting the court is to identify the requisite degree of efficiency,

or fit, that intermediate scrutiny demands. While I would not suggest that this will be a simple job, both advocates before the court and the members of the court itself should confront the difficulty in the earliest possible case, for until the job is attempted, the intermediate nature of the scrutiny will remain elusive. Fortunately, however, the facts of the case before us allow for application of what the *Carson* opinion claims to be intended, even without a more exactly articulated standard of legislative tailoring than the court has as yet announced.

I reach this conclusion by viewing the instant case from a point on which my colleagues and I agree. The majority opinion follows this court's earlier recognition that "'there *are* real and vital differences between the situations of governmental units and of private parties as potential tort defendants,' Cooperrider, *The Court, the Legislature, and Governmental Tort Liability in Michigan,* 72 MICH. L. REV. 187, 272 (1973) (emphasis in original)." *Estate of Cargill v. City of Rochester,* 119 N.H. 661, 666, 406 A.2d 704, 706 (1979), and I join in the court's general conclusion that it was open to the legislature to find it inappropriate to hold municipalities to an ordinary negligence standard insofar as they own and maintain highways and sidewalks.

Although this position implies that a municipal immunity defense against some tort claims arising out of sidewalk and highway defects would not necessarily deny equal protection under the standard of intermediate scrutiny, the court nonetheless hypothesizes two circumstances under which application of the municipal immunity conferred by RSA 507-B:2, I, would violate that standard: when the municipality in the course of maintenance or construction created the hazard that eventuated in the plaintiff's injury, and when the municipality failed to repair a hazardous condition of which an official or employee had actual knowledge with adequate opportunity to act. On the basis of these possibilities the court rules that the classification in issue "is unreasonably broad, is arbitrary, and does not bear a fair and substantial relation to the legislative objective" of relieving municipalities of negligence liability associated with road and sidewalk construction and maintenance.

I part company from the court here for two reasons. The first is principally analytical, and I will not dwell on it. The court seems to ignore *Carson*'s emphasis on the composite character of the test, the first segment of which is merely the first-tier rational basis test. Leaving aside the question whether anything is gained by incorporating the first-tier standard into the second-tier, it suffices to say

that my view of applying *Carson*'s second segment implies that the statute in question here would pass the rational basis test, and I assume that the court would likewise give it a passing grade on that test alone.

It is over the application of the second segment of *Carson*'s standard that the substantial disagreement occurs, and to understand that disagreement there is need to look more carefully at the governmental objective that the court assumes to be a legitimate object of legislation. As I noted above, the court speaks of that objective as relief from an unreasonable burden of satisfying an ordinary negligence standard with respect to streets and highways that are "subject to constant and unsupervised public use." The point of the remainder of the court's opinion, however, is that relief from liability arising from street and highway maintenance and construction is a legitimate objective only to the extent that the liability would not arise from hazardous conditions created by a municipal employee, officer or contractor, or actually known to a municipal agent. If we accept the court's view of the permissible objective, then, it is relief from liability stemming from road hazards neither municipally created nor known that is the end to be kept in view when answering the questions whether the means chosen are fairly and substantially related to a legitimate objective.

In assessing those means we must not, of course, view the particular immunity statute in isolation. As the court recognizes to a degree, the statutory immunity from negligence liability under RSA 507-B:2, I, is part of a total scheme, in which other statutes narrow the immunity that § 2, I, would otherwise provide. See RSA 507-B:5. Thus, RSA 231:90 and :91 provide for municipal liability for damage resulting from disrepair or travel hazards on Class IV or V highways and their bridges, if the municipality fails to begin repairs within twenty-four hours after receiving notice of the safety hazard from three or more citizens or taxpayers. RSA 231:92, moreover, subjects municipalities to liability for damage resulting from the unsuitability for travel of any bridge, culvert, sluiceway or dangerous embankment subject to town maintenance. (And, though not directly relevant here, RSA 231:75 and :77 provide for assessment of damages against the town for harm to land caused by grading and ditching a highway.)

In the main, then, there is no municipal immunity from liability when harm results from especially hazardous highway features or risky maintenance chores, or when the town fails to respond promptly to notice of any condition dangerous enough to excite com-

plaints by three people. Conversely, the remaining sources of liability are those most likely to elude municipal notice in the absence of constant systematic inspections of all municipal sidewalks and highways, which the majority agree the legislature could find it unreasonable to require.

The statutory scheme, in other words, classifies victims by barring recovery to those whose damages result from highway and sidewalk conditions and operations that are not notably hazardous *per se*, and that fail to excite three or more people to provide notice to the municipality. By leaving a town potentially liable in most other instances, the scheme avoids much of the overinclusiveness that might arguably result from absolute immunity from liability for any street or highway hazard, even for highway features with a generally high potential for harm, or about which actual notice might have been given repeatedly. Municipal immunity under this statutory scheme is thus tailored more narrowly than the State immunity that would have been conferred by the bill considered by *Opinion of the Justices*, 126 N.H. 554, 566–67, 493 A.2d 1182, 1184 (1985) (which is therefore without persuasive authority on the present facts), and it exhibits no apparent underinclusiveness, *i.e.*, in recognizing liability in cases where a municipality cannot fairly be held to the standard appropriate for other potential defendants.

Now, the fit is admittedly not mathematically exact between this total scheme and the objective of immunity only as to hazards not municipally created or known at least to one municipal agent. The majority are correct that the legislature could have narrowed the immunity provisions even further by making a town liable whenever a hazard is known to any of its officials, or whenever the hazard was created in the course of construction and maintenance activities.

There are two reasons, however, why this less-than-mathematically-precise fit should still qualify as fair and substantial. One of those reasons is suggested in the court's own opinion: if allegations of negligence in construction, or notice to some municipal agent, are enough to counter a municipal immunity claim in the first instance, there will be precious few street and sidewalk accidents without a subsequent lawsuit against a city or town, and the court's view of immunity's proper scope will entail a serious burden of defending against such claims. Certainly the legislature could reasonably choose the scope of immunity embodied in the present statutory scheme in order to obviate the unmeritorious litigation that would attend the narrower concept favored by the court.

The second reason for finding a sufficiently fair and substantial fit between the court's view of legitimate immunity and this statutory scheme is that we have no reason to believe that in practice there would be any large gap between the immunity the court would allow and the immunity the statutory scheme would produce. Because there is no indication of the number or proportion of highway and sidewalk hazards that eventuate from municipal indifference or negligence in construction, there is no indication that the statutory immunity is overinclusive to any significant degree. It is crucial to recognize this, lest we lose sight of the point that we are supposed to be applying an intermediate standard, and should not demand the precise congruence of problem and solution that would be appropriate, say, if a fundamental right recognized by the Constitution were at stake. When, on the contrary, the majority of the court rely on two possibilities of wholly uncertain significance to strike down the statute in issue, their ruling cannot be understood as an instance of intermediate equal protection review, but as one of strict scrutiny wholly inappropriate when the trigger of judicial oversight is the limitation of a right with less than fundamental constitutional significance.

And so the "fair and substantial" relation test is metamorphosed yet again. A formulation that began its juridical life as a rational basis test, and was ostensibly adopted by this court as a standard of intermediate review, is now being applied by a majority of the court to impose the strictest scrutiny known to equal protection analysis. There could be no more striking argument for the need to reexamine the *Carson* test and the conceptual basis underlying what passes for intermediate review.

THAYER, J., joins in the dissent.