GAYLE E. HAMAN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED, PLAINTIFF, V. FRANK MARSH, TREASURER OF
THE STATE OF NEBRASKA, ET AL., DEFENDANTS, AND SECURITY
INVESTMENT COMPANY, INTERVENOR.

467 N.W.2d 836

Filed March 29, 1991.    No. 90-474.

James T. Gleason and Donald J. Buresh, of Stalnaker, Becker, Buresh, Gleason & Farnham, P.C., for plaintiff.

Robert M. Spire, Attorney General, and Lisa D. Martin-Price for defendants.

Kim M. Robak and David A. Ludtke, of Rembolt Ludtke Parker & Berger, for intervenor.

Robert T. Grimit and Michael A. England, of Baylor, Evnen, Curtiss, Grimit & Witt, for amicus curiae receiver.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

PER CURIAM.

In this original action, Gayle E. Haman, a resident Nebraska taxpayer, on behalf of herself and all others similarly situated, attacks the constitutionality of legislation which would pay $33.8 million of state tax money to depositors who have suffered losses due to the failure of industrial loan and investment companies in Nebraska.

Because 1990 Neb. Laws, L.B. 272A, passed by Nebraska's Ninety-first Legislature, Second Session, is (1) special legislation which creates (a) an unreasonable and (b) a closed classification, in contravention of Neb. Const. art. III, § 18, and (2) gives the state's credit to a private corporation, in contravention of Neb. Const. art. XIII, § 3, it is unconstitutional.

On November 1, 1983, the Nebraska Department of Banking and Finance (department) closed Commonwealth Savings Company (Commonwealth) and placed it in receivership. On January 4, 1985, the Nebraska Depository Institution Guaranty Corporation (NDIGC), a private corporation created to insure deposits up to $30,000 in industrial loan and investment companies and cooperative credit associations (industrial companies), turned over and surrendered all of its assets to the receiver of Commonwealth. The NDIGC thereafter has had no assets to fulfill its guaranty of any deposits in any depository institution.

On March 20, 1985, the receiver filed a tort claim lawsuit against the State of Nebraska in the district court for Lancaster County. The suit alleged numerous acts of wrongful and negligent conduct by the department in its supervision, regulation and examination of Commonwealth and in admitting Commonwealth as a member of the NDIGC. This suit ended with a court-approved settlement of $8.5 million as a full and complete compromise of any and all legal claims of the receiver, Commonwealth holders of certificates of indebtedness, and creditors against the state and its officials. See *Weimer v. Amen*, 235 Neb. 287, 455 N.W.2d 145 (1990).

After the closing of Commonwealth, all but two of the remaining industrial companies either merged with, or were purchased by, other financial institutions, received charters to operate as banks, or sought protection by reorganization under Chapter 11 of the U.S. Bankruptcy Code. The two remaining industrial companies which have continued to operate are First Commerce Savings of Lincoln, Nebraska, and Commerce Savings of Columbus, Nebraska. The stipulation of the parties indicates that the depositors of these two industrial companies are now insured by the FDIC. The only two industrial companies to seek bankruptcy protection were American Savings Company and State "Securities" Savings Company. Legal claims filed by these two companies against the state were dismissed by demurrer and then dismissed voluntarily on appeal, see *American Savings Co. v. State*, 230 Neb. xvii (case No. 87-492, Nov. 7, 1988), and by demurrer affirmed on appeal, see *Security Inv. Co. v. State*, 231 Neb. 536, 437

N.W.2d 439 (1989). Only Commonwealth was placed in receivership.

In 1984, Nebraska's Legislature provided that industrial loan and investment companies organized under state law must, within 6 months of March 13 of that year, obtain and continually maintain insurance of their savings or certificates of indebtedness by membership in the FDIC, merge with an institution holding such membership and insurance, or provide notice to their depositors that their deposits were not insured. Any industrial loan and investment company organized after March 13, 1984, was and is required to comply with the same requirements before commencing its operations. See Neb. Rev. Stat. § 8-407.03 (Reissue 1987).

As a response to the losses to specified depositors because of the demise of the NDIGC, Nebraska's Legislature passed L.B. 272A, and the Governor signed the act on April 2, 1990. This legislation authorized the department to fulfill the $30,000 guaranty of each and every deposit. The Legislature appropriated $16.9 million for each of two fiscal years, with the intent of future appropriations from time to time until the $30,000 guaranties are discharged.

The pertinent provisions of L.B. 272A read as follows:

Section 1. For purposes of this act:

(1) Company in receivership shall mean an industrial company which is being liquidated by a receiver or the department;

(2) Department shall mean the Department of Banking and Finance;

(3) Deposit shall mean a certificate of indebtedness . . . which was unpaid when a protected company filed bankruptcy pursuant to Chapter 11 of the United States Bankruptcy Code or when a company in receivership entered receivership;

. . . .

(5) Industrial company shall mean any industrial loan and investment company;

. . . .

(7) Protected company shall mean an industrial company that filed bankruptcy pursuant to Chapter 11

... after November 1, 1983 ...

    . . . .

Sec. 2. The Legislature hereby finds and declares that the [NDIGC] was formed with department approval to protect depositors of certain financial institutions. . . . [I]n 1977 the Legislature enacted what now appears as section 21-17,144 which requires every depository institution to display at each place of business maintained by it a sign or signs indicating that its member or depositor accounts are protected by the [NDIGC] and that it include in all of its advertisements a statement to the effect that its member or depositor accounts are protected by the [NDIGC].

The Legislature further finds and declares that prior to the department's approval of Commonwealth . . . as a member of the [NDIGC] the department knew or should have known that Commonwealth . . . was in unsatisfactory financial condition . . . . [B]eginning in 1982 the department knew that Commonwealth . . . was insolvent, but at no time prior to November 1, 1983, did the department report [Commonwealth's] insolvency to other industrial companies or to the public, and at no time did the department prior to November 1, 1983, take action against Commonwealth . . . or its officers. . . .

The Legislature further finds and declares that on November 1, 1983 . . . the department, without regard to whether other industrial companies were solvent, publicly ordered all other industrial companies to refuse to allow depositors to withdraw funds unless the depositors' certificates of indebtedness had matured. The publication of such an order caused depositors to lose confidence in industrial companies, to withdraw their deposits as soon as their certificates of indebtedness matured, and to decline to reinvest their money in any other industrial company. Therefor the assets of such industrial companies were continuously drained until all such companies were forced to merge with or be purchased by other financial institutions or to seek protection by reorganization under Chapter 11 . . . . Because of the above chain of events, after November 1, 1983, holders of certificates of

indebtedness in industrial companies which later became protected companies were paid in full if their certificates . . . matured before the industrial company filed bankruptcy, but those whose certificates . . . happened to mature afterwards received only partial payment.

. . . .

The Legislature further finds and declares that the enactment of the Nebraska Property and Liability Insurance Guaranty Association Act has allowed state funds by means of premium tax credits to be used to protect policyholders in insolvent insurance companies, and the same principle should be extended to depositors in insolvent industrial companies.

The Legislature further finds and declares that the actions of the department [and] the requirement passed by the Legislature in section 21-17,144, that is, that the thirty-thousand-dollar guaranty of each deposit by the [NDIGC] be displayed and advertised, and principles of fairness all require that the State of Nebraska fulfill the thirty-thousand-dollar guaranty of each and every deposit.

Sec. 3. In addition to the findings in section 2 of this act, the Legislature further finds and declares that the circumstances recited in such section have seriously impaired the confidence of the people of this state in the Legislature and in the enactments of the Legislature such as section 21-17,144 . . . the welfare and stability of this state and its financial institutions require that the people have confidence in the Legislature and in the financial institutions . . . and the redemption of the guaranty to depositors by the [NDIGC] will serve a necessary public purpose and will effect a sound and necessary public policy.

Sec. 4. The department shall, from money appropriated to it from time to time, distribute to depositors sums of money to be applied to the payment of deposits up to thirty thousand dollars. . . . To ensure fair and equitable distribution of the money appropriated and that all depositors will recover the guaranteed portions of

their deposits at approximately the same time, the distributions shall be allocated so that, at any one point in time, all depositors shall be reasonably assured of recovering the same percentage of the guaranteed portions of their deposits . . . .

. . . .

Sec. 6. When payment has been offered to all depositors in the full amount of the thirty-thousand-dollar guaranty, then, but not before, the offer of such payment to each depositor shall (1) constitute a full satisfaction of the depositors' claims against the state based on the guaranty by the [NDIGC] . . . .

1990 Neb. Laws, L.B. 272A.

At the time L.B. 272A was passed, only depositors of Commonwealth, American Savings, and State Securities Savings fit within the defined class of recipients. Shortly after L.B. 272A was signed by the Governor, this suit was filed, and a temporary restraining order was issued by this court on June 29, 1990, halting any planned disbursements.

The plaintiff, a nondepositor Nebraska taxpayer and resident, prays that this court declare L.B. 272A unconstitutional, permanently enjoin its implementation, and award her attorney fees and costs.

The defendants were sued in their official capacities as officers of the State of Nebraska. Defendants, Frank Marsh, Treasurer; Deb Thomas, Director of Administrative Services; and Cynthia H. Milligan, Director of Banking and Finance, ask this court to find L.B. 272A constitutional as a legitimate exercise of police power, dismiss plaintiff's original action with prejudice, and tax all costs to the plaintiff.

Briefs were also submitted by Security Investment Company, as intervenor and successor in interest to and assignee of State Security "Investment" Co. (Intervenor), and the receiver of Commonwealth, as amicus curiae (Amicus), in support of the constitutionality of L.B. 272A.

The plaintiff makes four arguments attacking the constitutionality of L.B. 272A, as follows:

(1) The state had no preexisting legal duty to pay depositors. Any liability to the Commonwealth depositors was discharged

by the settlement between the receiver and the state and the appropriation of $8.5 million to consummate that settlement. The depositors of State Securities Savings and American Savings, the only other institutions covered by the legislation, had their claims dismissed. Legislation which acts retroactively to compensate private individuals is invalid because it violates due process of law, it effects an unreasonable classification, and it constitutes special legislation.

(2) Legislation which operates upon or affects a closed class constitutes special legislation and creates an unreasonable classification, in violation of Neb. Const. art. I, § 16, and Neb. Const. art. III, § 18. L.B. 272A operates upon a class consisting of Commonwealth, American Savings, and State Securities Savings depositors, which class is closed, leaving no room or opportunity for an increase in the members of the class.

(3) L.B. 272A violates Neb. Const. art. XIII, § 3, which prohibits the state, except in circumstances not relevant here, from giving or loaning its credit in aid of any individual, association, or corporation.

(4) Legislation which has no regulatory function, which bears no rational relationship to the welfare of the public, and which is contrary to the provisions of the Constitution cannot be justified as an exercise of police power.

Claims of unconstitutionality must be examined under the following rules of law: The party claiming that a legislative act is unconstitutional has the burden of establishing such unconstitutionality, and all reasonable doubts will be resolved in favor of constitutionality. *In re Application A-16642*, 236 Neb. 671, 463 N.W.2d 591 (1990). Unconstitutionality of a statute must be clearly demonstrated before a court can declare the statute unconstitutional. *State ex rel. Spire v. Beermann*, 235 Neb. 384, 455 N.W.2d 749 (1990). The Legislature cannot circumvent an express provision of the Constitution by doing indirectly what it may not do directly. *Banner County v. State Bd. of Equal.*, 226 Neb. 236, 411 N.W.2d 35 (1987).

## SPECIAL LEGISLATION

We begin by addressing the plaintiff's first and second arguments, whereby she claims that L.B. 272A is special

legislation. The pertinent constitutional provision is as follows:

> The Legislature shall not pass local or special laws in any of the following cases, that is to say:
>
> . . . .
>
> Granting to any corporation, association, or individual any special or exclusive privileges, immunity, or franchise whatever . . . . In all other cases where a general law can be made applicable, no special law shall be enacted.

Neb. Const. art. III, § 18.

By definition, a legislative act is general, and not special, if it operates alike on all persons of a class or on persons who are brought within the relations and circumstances provided for and if the classification so adopted by the Legislature has a basis in reason and is not purely arbitrary. See *Bauer v. State Game, Forestation and Parks Commission*, 138 Neb. 436, 293 N.W. 282 (1940). A legislative act that applies only to particular individuals or things of a class is special legislation. See, *Jackson County v. Jackson Educ. Serv. D.*, 90 Or. App. 299, 752 P.2d 1224 (1988); *Madison Metropolitan Sewerage Dist. v. Stein*, 47 Wis. 2d 349, 177 N.W.2d 131 (1970); 1 W. Blackstone, Commentaries *86. General laws embrace the whole of a subject, with their subject matter of common interest to the whole state. Uniformity is required in order to prevent granting to any person, or class of persons, the privileges or immunities which do not belong to all persons. See 2 N. Singer, Statutes and Statutory Construction § 40.07 (4th ed. 1986). It is because the legislative process lacks the safeguards of due process and the tradition of impartiality which restrain the courts from using their powers to dispense special favors that such constitutional prohibitions against special legislation were enacted. See 2 N. Singer, *supra*, § 40.01.

A legislative act can violate Neb. Const. art. III, § 18, as special legislation in one of two ways: (1) by creating a totally arbitrary and unreasonable method of classification, or (2) by creating a permanently closed class. See *City of Scottsbluff v. Tiemann*, 185 Neb. 256, 175 N.W.2d 74 (1970).

UNREASONABLE CLASSIFICATION

The term "class legislation" is a characterization of legislation in contravention of Neb. Const. art. III, § 18. *State, ex rel. Taylor, v. Hall*, 129 Neb. 669, 262 N.W. 835 (1935). It is that which makes improper discrimination by conferring privileges on a class arbitrarily selected from a large number of persons standing in the same relation to the privileges, without reasonable distinction or substantial difference. 16B C.J.S. *Constitutional Law* § 682 (1985).

The plaintiff cites various cases, most notably *Cox v. State*, 134 Neb. 751, 279 N.W. 482 (1938), wherein the factual situation parallels the case at bar. In *Cox*, the Legislature created a liability in favor of an individual plaintiff for the tort of the state's agents and servants that resulted in injury to her while she was traveling a highway under the control of the state. The statute waived the sovereignty of the state and the statute of limitations. This court held that such a bill violated Neb. Const. art. III, § 18, as special legislation, since "only by general law, uniform in its application to persons, can a liability of the state be constitutionally created for the negligence of its agents and servants." 134 Neb. at 754, 279 N.W. at 484. While the Legislature may make classifications, it cannot do so arbitrarily and unreasonably. A reasonable classification must operate equally on all within the class. *Cox, supra.*

The defendants argue, without citation, the proposition that "legislative classifications will be upheld as long as there is some rational basis for establishing the classification or there is a valid public policy reason for establishing the legislative classification." (Emphasis omitted.) Brief for defendants at 14.

Contending that a rational basis exists for L.B. 272A, the defendants argue it was enacted in response to a unique situation involving a class of individuals who suffered a real difference in harm from those outside the class.

Based on the proposition that any act is permissible if it is reasonably designed for promotion of public health, safety, morals, security, prosperity, contentment, or the general welfare of a state's inhabitants, the defendants also contend that there was a valid public purpose for enacting the legislation. The defendants maintain that a moral obligation

existed on the part of the state and that L.B. 272A would extinguish this moral obligation and, in turn, instill confidence in the Legislature, its enactments, and the state banking system.

In essence, the defendants argue that there was a public purpose for L.B. 272A and that since what is accomplished under the act is rationally related to that purpose, this court should defer to the findings of the Legislature. Nothing in the briefs of the Intervenor or Amicus add to this contention.

We must first consider the applicable test for determining the constitutionality of legislative classifications, which test has been set out succinctly by prior case law.

> "A legislative classification, in order to be valid, must be based upon some reason of public policy, some substantial difference of situation or circumstances, that would naturally suggest the justice or expediency of diverse legislation with respect to objects to be classified. Classifications for the purpose of legislation must be real and not illusive; they cannot be based on distinctions without a *substantial* difference. . . ." . . . "Classification is proper if the special class has some reasonable distinction from other subjects of like general character, which distinction bears some reasonable relation to the legitimate objectives and purposes of the legislation. The question is always whether the things or persons classified by the act form by themselves a proper and legitimate class with reference to the purpose of the act."

(Citation omitted.) (Emphasis omitted.) *State ex rel. Douglas v. Marsh*, 207 Neb. 598, 609, 300 N.W.2d 181, 187 (1980).

From the foregoing, we are unpersuaded by the analysis of the defendants. Despite lengthy briefs by all those supporting L.B. 272A's constitutionality, their analysis is flawed by the use of a faulty proposition of law. Repeated again, they presuppose that "legislative classifications will be upheld as long as there is some rational basis for establishing the classification or there is a valid public policy reason for establishing the legislative classification."

The first and most obvious flaw is that the proposition is disjunctive. Under that flawed proposition, either a rational basis or public policy would support the constitutionality of

L.B. 272A. However, we have previously disposed of this argument. If the purpose of a legislative act is unclear and the Legislature declares a public purpose which is not invalid on its face, this court will give strong consideration to the intent of the Legislature, but if the act is clearly contrary to the Constitution, the court must declare the act unconstitutional regardless of the proclaimed legislative intent. See, *State ex rel. Spire v. Public Emp. Ret. Bd.*, 226 Neb. 176, 410 N.W.2d 463 (1987); *State ex rel. Douglas v. Nebraska Mortgage Finance Fund*, 204 Neb. 445, 283 N.W.2d 12 (1979) (Legislature may not, under the guise of public purpose, pass a law solely for the benefit of a select few). Therefore, despite the Legislature's proclamation of public purpose, if the act is otherwise violative of the Constitution, this court must declare it unconstitutional.

The second flaw in the defendants' presentation is that it relies upon an erroneous test. The defendants argue that rational basis is the appropriate test of legislation challenged as being in contravention of Neb. Const. art. III, § 18. In Nebraska, both equal protection and the prohibition against special legislation emanate from that constitutional provision. See *Distinctive Printing & Packaging Co. v. Cox*, 232 Neb. 846, 443 N.W.2d 566 (1989). Some states have found these theories to be similar, applying the rational basis test for both. However, the appropriate tests are clearly not the same.

Under equal protection, classifications that do not involve a suspect class or fundamental right are tested for rational basis. All that is required is that there be a rational relationship between a legitimate state interest and the statutory means selected by the Legislature to accomplish that purpose. See, *Distinctive Printing & Packaging Co. v. Cox, supra* (rational basis for parental liability statute holding parents liable for children causing intentional property damage); *Snyder v. IBP, inc.*, 229 Neb. 224, 426 N.W.2d 261 (1988) (no rational basis for workers' compensation statute denying modification of previous award); *Drennen v. Drennen,* 229 Neb. 204, 426 N.W.2d 252 (1988) (no rational basis for granting different court access to various classes of child support payors).

However, the plaintiff has not attacked L.B. 272A on equal protection grounds but, rather, attacks it as special legislation.

The narrower special legislation prohibition supplements the equal protection theory. *McRoberts v. Adams*, 60 Ill. 2d 458, 328 N.E.2d 321 (1975). The test of validity under the special legislation prohibition is more stringent than the traditional rational basis test. Classifications must be based on some *substantial* difference of situation or circumstances that would naturally suggest the justice or expediency of diverse legislation with respect to the objects to be classified. See, *State ex rel. Douglas v. Marsh, supra* (there is no reasonable classification when the classes are based on historical facts alone); *Prendergast v. Nelson*, 199 Neb. 97, 256 N.W.2d 657 (1977) (there are substantial reasons for legislative discrimination in regard to malpractice actions); *Dwyer v. Omaha-Douglas Public Building Commission*, 188 Neb. 30, 195 N.W.2d 236 (1972) (limiting application of building commission act and tax levy power to cities of the metropolitan class and the counties in which they are located was not a classification that was clearly arbitrary and without substantial basis founded upon real differences).

There has obviously been a judicial tendency to blur the difference between the two tests, leading to the present confusion. *Dover v. Imperial Cas. & Indem. Co.*, 133 N.H. 109, 575 A.2d 1280 (1990) (Souter, J., dissenting). The difference in these tests is more than semantical because it affects the burden of persuasion placed upon the plaintiff.

> [U]nder the Equal Protection clause, both state and federal courts will uphold state laws which make economic classifications "unless 'the classification rests on grounds *wholly* irrelevant to the achievement of the State's objective' " [citation omitted], or unless the law "is so unrelated to the achievement of a legitimate purpose that it appears irrational" [citation omitted]. On the other hand, the test for statutes challenged under the special-laws prohibitions . . . is that they must bear "a reasonable and substantial relation to the object sought to be accomplished by the legislation."

*Benderson Development Co. v. Sciortino*, 236 Va. 136, 147, 372 S.E.2d 751, 757 (1988). Contra *Bilyk v. Chicago Transit Authority*, 125 Ill. 2d 230, 531 N.E.2d 1 (1988).

Having determined the applicable test, we consider whether L.B. 272A contravenes Nebraska's Constitution, which prohibits special legislation. The inquiry is whether payments to a class of failed industrial company depositors bear a reasonable and substantial relation to instilling confidence in the Legislature, its enactments, and the state banking system.

The plaintiff initially argues that there is no legal obligation on the part of the state to these depositors. See *Weimer v. Amen*, 235 Neb. 287, 455 N.W.2d 145 (1990). The defendants concede this point, but argue that a moral obligation exists on the part of the state to make such payments because of the negligence of its employees, agents, and servants and that the classification forms a rational basis serving a legitimate state interest.

The plaintiff responds to this argument by stating that "legislative appropriations in response to what are deemed to be moral obligations, invites [sic] open-ended appeals from those claiming injury where there is an arguable connection between that injury and state governmental activity." Reply brief for plaintiff at 4-5.

Addressing the defendants' argument, we have already determined that a mere rational basis nexus is insufficient. In specific regard to the moral obligation found by the Legislature, we need not rule whether a moral obligation would provide reasonable and substantial support for the classification in question, for we find that no moral obligation existed. In *Wakeley v. Douglas County*, 109 Neb. 396, 400, 191 N.W. 337, 339 (1922), this court held that a moral obligation attaches when there is "a law [which] is passed notifying and warning the taxpayer and the citizen generally that the state . . . will undertake the burden of such damages." Nowhere in the NDIGC legislation was such a notification or warning present. In fact, the NDIGC act provides that "[n]o state funds of any kind shall be allocated or paid to the corporation." Neb. Rev. Stat. § 21-17,135(4) (Reissue 1987). As we have previously stated, the NDIGC was a private corporation. See *Weimer, supra*. Amicus argues that an average depositor would not know this and would understand that the manner and form of the guaranty notice meant that the NDIGC was backed by the

state. For this, we remind the defendants and Amicus of the maxims that ignorance of the law is no excuse and that everyone is presumed to know the law.

There is no reasonable and substantial relationship between the classification and the object sought to be accomplished by L.B. 272A. Payments of deposits in a now defunct private guaranty system can hardly be said to instill confidence in the state's banking depositors. All deposits are now federally insured or not insured at all. If not insured, notice is given to the depositor. It appears the opposite result of that intended by the Legislature in enacting L.B. 272A would occur. The act would instill fear rather than confidence, for it indicates that every time someone is injured, the state will rescue him or her. The result could be either economic bankruptcy or economic suffocation through taxation. The scheme outlined by L.B. 272A extends even further than the statute in *Cox v. State*, 134 Neb. 751, 279 N.W. 482 (1938). It not only would create a liability in favor of individual plaintiffs for the tort of the state's agents and servants, but would go further by conceding guilt and determining damages.

In the words of Justice Cardozo: "If the evil to be corrected can be seen to be merely fanciful, the injustice or the wrong illusory, the courts may intervene and strike the special statute down." *Williams v. Mayor*, 289 U.S. 36, 46, 53 S. Ct. 431, 77 L. Ed. 1015 (1933). This applies precisely to the classification in question. There is no reasonable and substantial relation between the classification and the stated objects of the legislation. "Whether a classification is arbitrary 'depend[s] upon the purpose and subject of the particular act and the circumstances and conditions surrounding its passage.' " *Etheridge v. Medical Center Hospitals*, 237 Va. 87, 102, 376 S.E.2d 525, 533 (1989). There is no question that L.B. 272A was enacted strictly on behalf of the Commonwealth, American Savings, and State Securities Savings depositors. We reiterate the words of this court from 60 years ago: "Clearly it has not yet come to pass that the state, in its supervision of the banking business, has become an eleemosynary institution." *Weaver v. Koehn*, 120 Neb. 114, 117, 231 N.W. 703, 704 (1930) (holding that the appropriation of money by the state to reimburse

depositors for losses sustained by them in failed banks clearly appears to be the taking of money belonging to one class to pay the claims of another class, and that is in violation of the due process provisions of the federal and state Constitutions).

## CLOSED CLASS

Plaintiff also claims that the class of depositors is closed. Although the parties agree on the definition of a closed class, each party draws different conclusions as to the character of the statutory classification in question.

> "The rule appears to be settled by an almost unbroken line of decisions that a classification which limits the application of the law to a present condition, and leaves no room or opportunity for an increase in the numbers of the class by future growth or development, is special, and a violation of the clause of the constitution above quoted. . . ."

*City of Scottsbluff v. Tiemann*, 185 Neb. 256, 262, 175 N.W.2d 74, 79 (1970) (quoting *State v. Kelso*, 92 Neb. 628, 139 N.W. 226 (1912)).

The plaintiff argues that the group of recipients under the act is identified and fixed by historical circumstance to include only the depositors of Commonwealth, State Securities Savings, and American Savings.

The plaintiff describes what she deems a "highly unlikely (if not impossible)" sequence of events whereby the class of depositors could expand beyond the aforementioned industrial companies:

> First, new industrials would have to be chartered. Second, they would have to become members of the NDIGC (or the only two industrials which presently exist would have to renounce their FDIC coverage and become members of the NDIGC), and the deposits of those industrials would have to be guaranteed by the NDIGC. Third, those industrials would have to go into receivership or bankruptcy. And, fourth, the depositors of those institutions would have to suffer deposit losses.

Reply brief for plaintiff at 14.

With the plaintiff bearing the burden of proving the act

unconstitutional, the issue becomes, to what degree must the plaintiff prove that the class is closed? The defendants argue that

> [t]he plain language of LB 272A is open-ended. It does not name any industrial . . . companies which would benefit from its enactment. . . .
>
> . . . .
>
> The possibility for future growth or development in the class created by the Legislature need not be definite or certain. The possibility for future growth or development is sufficient to sustain a constitutional challenge on the basis of a closed class.

Brief for defendants at 43, 46. Amicus argues that

> [a] closed class is only present if, by the explicit language of the legislative act, the class is fixed and may never be increased. This standard is not satisfied by a probability, only by a certainty. . . . [T]he plaintiff must prove that the class defined by LB 272A is absolutely closed.

Brief for Amicus at 24.

In determining whether a class is closed, this court is not limited to the face of the legislation, but may consider the act's application. See, *Axberg v. City of Lincoln*, 141 Neb. 55, 2 N.W.2d 613 (1942); *Gossman v. State Employees Retirement System*, 177 Neb. 326, 129 N.W.2d 97 (1964) (court refused to follow form and ignore the substance). See, also, *State v. Stuht*, 52 Neb. 209, 71 N.W. 941 (1897); *In re Freygang*, 46 N.J. Super. 14, 133 A.2d 672 (1957); *Wrenn v. Portland Loan Co.*, 155 Or. 395, 64 P.2d 520 (1937); *Mason v. City of Paterson, et al.*, 120 N.J. Super. 184, 293 A.2d 460 (1972).

In the context in which L.B. 272A operates we are compelled to find that the act represents a closed classification. Despite Amicus' argument that the plaintiff must prove the class is absolutely closed, our case law does not impose such a burden. See *City of Scottsbluff v. Tiemann, supra* (legislation directing certain cities to establish municipal courts found unconstitutional because it assured that *in practical operation* the class was limited to two cities). In deciding whether a statute legitimately classifies, the court must consider the actual probability that others will come under the act's operation. If

the prospect is merely theoretical, and not probable, the act is special legislation. The conditions of entry into the class must not only be possible, but reasonably probable of attainment. *Republic Inv. Fund I v. Town of Surprise*, 166 Ariz. 143, 800 P.2d 1251 (1990); 2 N. Singer, Statutes and Statutory Construction § 40.09 (4th ed. 1986). The defendants cannot merely rest on the form of the act. The realities of the situation are that except for a highly improbable set of events the class is permanently closed to future members. All industrial companies must now be federally insured or post notice that they are not insured at all. See § 8-407.03. They cannot rely on the NDIGC. To force the plaintiff to disprove every possible contingency would be to accept artful draftsmanship over reality.

Having determined that the classification, as defined by L.B. 272A, was unreasonable and that there is no reasonable probability that the class will increase in members by future developments, we find the act unconstitutional in contravention of Neb. Const. art. III, § 18, as special legislation.

## PUBLIC CREDIT TO CORPORATIONS

The plaintiff claims that L.B. 272A is also unconstitutional because it unlawfully pledges the credit of the state. The relevant constitutional provision reads as follows: "The credit of the state shall never be given or loaned in aid of any individual, association, or corporation . . . ." Neb. Const. art. XIII, § 3.

Except for certain circumstances not relevant here, the purpose of article XIII, § 3, of Nebraska's Constitution is to prevent the state or any of its governmental subdivisions from extending the state's credit to private enterprise. *United Community Services v. The Omaha Nat. Bank*, 162 Neb. 786, 77 N.W.2d 576 (1956). It is designed to prohibit the state from acting as a surety or guarantor of the debt of another. See *State ex rel. Jardon v. Ind. Dev. Auth., etc.*, 570 S.W.2d 666 (Mo. 1978). Similar provisions are found in most other state constitutions, the historical genesis of which was described in *City of Tempe v. Pilot Properties, Inc.*, 22 Ariz. App. 356, 360,

527 P.2d 515, 519 (1974), wherein the court stated:

> The purpose of this constitutional provision, which appears in some form in most states, was set forth in State v. Northwestern Mutual Insurance Co., 86 Ariz. 50, 340 P.2d 200 (1959), quoting from Thaanum v. Bynum Irr. Dist., 72 Mont. 221, 232 P. 528 (1925):
>
> " 'It represents the reaction of public opinion to the orgies of extravagant dissipation of public funds by counties, townships, cities and towns in aid of the construction of railways, canals, and other like undertakings during the half century preceding 1880, and it was designed primarily to prevent the use of public funds raised by general taxation in aid of enterprises apparently devoted to *quasi* public purposes, but actually engaged in private business.' 86 Ariz. at 53, 340 P.2d at 201. (Emphasis in original.)"

The plaintiff argues that L.B. 272A constitutes a promise by the state to make good on the future claims of new class members, as well as on the redemption of guaranties, on purported moral grounds, to those presently within the class.

The defendants, although arguing with respect to article III, § 18, claim that a public purpose existed for the enactment of L.B. 272A. Because public purpose alone will not save a statute otherwise in contravention of article III, § 18, and because we found L.B. 272A to be special legislation which is prohibited by article III, § 18, it was not necessary to determine under that section of the Constitution whether a public purpose existed in the enactment of L.B. 272A.

We begin our analysis by dissecting the components of article XIII, § 3. In order to establish L.B. 272A unconstitutional under article XIII, § 3, a plaintiff must prove each of the following elements: (1) The credit of the state (2) was given or loaned (3) in aid of any individual, association, or corporation.

The first question is whether L.B. 272A involves the "credit of the state." The state's credit is inherently the power to levy taxes and involves the obligation of its general fund. See *Tax Increment Fin. Com'n v. Dunn Const.*, 781 S.W.2d 70 (Mo. 1989). There is a distinction between the loaning of state funds and the loaning of the state's credit. When a state loans funds it

is in the position of creditor, whereas the state is in the position of debtor upon a loan of credit. *Utah Technology Finance Corp. v. Wilkinson*, 723 P.2d 406 (Utah 1986).

Here, there is no question that the credit of the state is unconstitutionally involved in L.B. 272A. In *State ex rel. Douglas v. Nebraska Mortgage Finance Fund*, 204 Neb. 445, 283 N.W.2d 12 (1979), this court upheld the constitutionality of a fund which assisted private mortgage lenders in providing mortgage financing for single-family residences at reduced interest rates. The statute did not violate article XIII, § 3, because only the fund was involved. The fund acquired the money through bond sales and was responsible for the payment of those bonds. If there were insufficient funds to make repayment, the state was neither obligated nor liable. See, also, *State v. City of Panama City Beach*, 529 So. 2d 250 (Fla. 1988). In contrast, under L.B. 272A the state would be forever liable for the losses of industrial company depositors if we accept, arguendo, that the class in L.B. 272A is open. The stated purpose of the act is redemption of the guaranties of a private corporation to depositors by obligating present and future taxes from the state's general fund. This is precisely the activity article XIII, § 3, was enacted to prohibit.

The next question is whether the state's credit was "given or loaned," as opposed to the state receiving valuable consideration. L.B. 272A provides that when payment is offered up to the full amount of the $30,000 guaranties, this (1) constitutes full satisfaction of the depositors' claims against the state and (2) constitutes an assignment of the depositors' claims against any other individual or entity. 1990 Neb. Laws, L.B. 272A, § 6. Neither of these represents valuable consideration. All legal claims against the state, its officers, and its employees were settled, see *Weimer v. Amen*, 235 Neb. 287, 455 N.W.2d 145 (1990), or were dismissed. As previously noted, no moral obligation exists. The assignment of the depositors' relatively worthless claims against other individual or entities does not change this conclusion. In *Labor & Indus. v. Wendt*, 47 Wash. App. 427, 735 P.2d 1334 (1987), the Washington Department of Labor and Industries received valuable consideration in paying workers' compensation benefits because it received the right to

recoup an amount equal to any benefits paid to the injured worker plus attorney fees and costs. The state could never come close to receiving an equal amount to the proposed disposition of funds by acquiring legal claims against industrial companies that had gone bankrupt or were in receivership. Looking beyond the wording of the statute, L.B. 272A, § 6, does not provide for valuable consideration, and thus we must conclude that the state's credit has been "given."

Next we address whether the state's credit was given "in aid of any individual, association, or corporation." This question is easily answered affirmatively by considering the act's stated purpose of fulfilling the NDIGC guaranties. The NDIGC, as we have stated, is a private corporation. See *Weimer v. Amen, supra*.

We reject the defendants' argument that public purpose necessarily saves the statute and avoids judicial scrutiny.

> "What is a public purpose is primarily for the Legislature to determine. A public purpose has for its objective the promotion of the public health, safety, morals, security, prosperity, contentment, and the general welfare of all the inhabitants. *No hard and fast rule can be laid down for determining whether a proposed expenditure of public funds is valid as devoted to a public use or purpose.* Each case must be decided with reference to the object sought to be accomplished and to the degree and manner in which that object affects the public welfare." [Citation omitted.]

> "It is the province of the Legislature to determine matters of policy and appropriate the public funds. If there is reason for doubt or argument as to whether the purpose for which the appropriation is made is public or a private purpose, and reasonable men might differ in regard to it, it is essentially held that the matter is for the Legislature." [Citation omitted.]

(Emphasis supplied.) *State ex rel. Douglas v. Thone*, 204 Neb. 836, 843, 286 N.W.2d 249, 253 (1979).

Closely related to the prohibition against the giving or lending of the state's credit, although technically not part of the prohibition due to the prohibition's narrow and specific

wording, is the principle of law that public funds cannot be expended for private purposes. *Utah Technology Finance Corp. v. Wilkinson*, 723 P.2d 406 (Utah 1986). As in our analysis of "unreasonable classifications," both principles emanate from the same constitutional provision. The distinction is the difference between expenditures and the extension of credit. Nowhere is this distinction more evident than in *Chase v. County of Douglas*, 195 Neb. 838, 241 N.W.2d 334 (1976), wherein we found a statute constitutional in part and unconstitutional in part. The statute provided for cities and counties (1) to expend funds for the purpose of encouraging immigration, new industries, and investments and to conduct a publicity campaign to support those goals and (2) to purchase real estate suitable for industrial development, to acquire options on real estate suitable for industrial development, and to renew or extend such options. In upholding the first part of the statute, we held that the expenditure of public funds for the general encouragement of growth and industry through such devices as advertising and publicity was a public purpose. Further, we found that this purpose was not vitiated by the disposition of the funds through private organizations because specific controls on the use of the funds were attached. See *Lenstrom v. Thone*, 209 Neb. 783, 311 N.W.2d 884 (1981).

In finding the second part of the statute unconstitutional, we held it involved an extension of credit of the governmental subdivision to some individual, association, or corporation for private use. If the real estate acquired decreased in value, the loss would be that of the subdivision.

The prohibition against the pledge of the state's credit does not hinge on whether the legislation achieves a "public purpose," when the pledge benefits a private individual, association, or corporation. *McGuffey v. Hall*, 557 S.W.2d 401 (Ky. 1977). The key is whether the state stands as a creditor through the expenditure of public funds or as a debtor by the extension of the state's credit to private corporations, associations, or individuals. The state is not empowered to become a surety or guarantor of another's debts. Since L.B. 272A attempts to do exactly that which is prohibited, there can be no question that it clearly contravenes Neb. Const. art. XIII,

§ 3.

Having held L.B. 272A unconstitutional in three separate particulars, any one of which is sufficient to declare the act void, we find no further discussion of either the plaintiff's or the defendants' position on constitutionality is necessary.

## ATTORNEY FEES

In regard to the plaintiff's request for attorney fees and costs, the general rule in Nebraska is that attorney fees and expenses may be recovered only in such cases as are provided for by statute, or where the uniform course of procedure has been to allow such a recovery. *Gottsch Feeding Corp. v. Red Cloud Cattle Co.*, 229 Neb. 746, 429 N.W.2d 328 (1988); *Quinn v. Godfather's Investments*, 217 Neb. 441, 348 N.W.2d 893 (1984). Neb. Rev. Stat. § 24-204.01 (Reissue 1989) provides, as relevant here:

> When an original action is instituted in the Supreme Court by or against the state, or any office, department, or officer thereof, involving the constitutionality of any act of the Legislature no matter when such act was passed, attorney fees and costs may be allowed if any of the following conditions set forth in subdivision (1), (2), or (3) of this section are found to exist:
>
> (1)(a) The action challenges the constitutionality of an act which the Attorney General has previously ruled constitutional or unconstitutional or as to which he has made no ruling . . . .

In this instance, the Attorney General issued an advisory opinion ruling that L.B. 272A was constitutional. Att'y Gen. Op. No. 90002 (Jan. 18, 1990). Section 24-204.01 further provides that if certain conditions are met, the Supreme Court shall allow reasonable attorney fees and costs in such amounts as the court shall determine. As stated, the necessary conditions were met. Thus, the plaintiff is entitled to attorney fees.

This court having declared L.B. 272A unconstitutional, judgment is hereby entered for the plaintiff and against the defendants and each of them in their official capacities. The Treasurer of the State of Nebraska is hereby permanently enjoined from disbursing on behalf of the State of Nebraska

any funds appropriated by 1990 Neb. Laws, L.B. 272A, to depositors of any former industrial loan and investment companies, and the Director of Administrative Services of the State of Nebraska and the Director of Banking and Finance of the State of Nebraska are enjoined from implementing the provisions of L.B. 272A.

Plaintiff is hereby awarded $10,000 to apply on her attorney fees and costs of this action, which shall be paid in accordance with § 24-204.01.

JUDGMENT FOR PLAINTIFF.