REQUESTED BY: Senator Ed Schrock Nebraska State Legislature
 INTRODUCTION
You have requested our opinion regarding the constitutionality of several amendments to LB 1065 and LB 479. LB 1065, as amended by AM2644, proposes changes to the Ethanol Development Act, Neb. Rev. Stat. §§66-1330 to 66-1348 (1996 and Cum. Supp. 2002) [the "Act"], and includes revisions to the Employment and Investment Growth Act, Neb. Rev. Stat. §§ 77-4101 to 77-4113(2003) and the Invest Nebraska Act, Neb. Rev. Stat. §§ 77-5501 to 77-5544 (2003). Section 12 of LB 1065 amends Neb. Rev. Stat. § 66-1345 to provide that transfers of ethanol production tax credits will be suspended if there are insufficient funds in the Ethanol Production Incentive Cash Fund ["EPIC Fund"] to reimburse the Highway Trust Fund until additional funds become available in the EPIC Fund for transfer to the Highway Trust Fund. Thereafter, the Department of Revenue ["Department"] will allow the transfer of accumulated credits earned by each ethanol producer on a prorated basis. Section 13 of AM26744 amends § 66-1344.01 to provide that the Tax Commissioner shall not accept any applications for new agreements after the effective date of act. Section 17 of AM2644 amends Neb. Rev. Stat. § 77-4101.01 to include a new subsection providing that Employment and Investment Growth Act incentives are not available to applicants under the Employment and Investment Growth Act for activity which results in benefits under the Ethanol Development Act. Finally, section 18 of AM2644 amends Neb. Rev. Stat. § 77-5536 to provide that Invest Nebraska Act benefits are not available for projects generating incentives under the Invest Nebraska Act for applications submitted after the effective date of the act.
LB 479, as amended by AM7164 and AM2713, includes a number of changes and additions to Neb. Rev. Stat. § 66-1344 relating to "new ethanol facilities." Section 4 of AM7164 provides that a new ethanol facility must produce at least 8,219 gallons of ethanol within a thirty-day period, which must be a finished product ready for sale to customers. This section amends the definition of "new ethanol facility," in part, to exclude expansion of existing plants after June 30, 2004, but AM2713 provides this definition applies only to agreements entered into after the effective date of the act. AM2713, p. 10, 3. Section 4 of AM7164 includes several other changes to § 66-1344, including: (1) Requiring that ethanol production is to be measured by a device approved by the Division of Weights and Measures of the Department of Agriculture; (2) Limiting claims for credits to within three years of the date ethanol is produced or by September 30, 2012, whichever occurs first; (3) Establishing record-keeping requirements for ethanol producers; (4) Requiring producers to give preference to Nebraska resident bidders when awarding construction contracts for facilities, and denying credits if a nonresident contractor is awarded the bid and the Department later determines a resident contractor made a comparable bid; (5) Applying motor vehicle fuel tax administrative criteria to excess credit and deficiency determinations; and (6) Providing a grievance process for Department determinations relating to ethanol credits. AM2713 also amends § 66-1344 to require a new ethanol facility to provide the Department with written evidence substantiating the facility has received requisite authority from the Nebraska Department of Environmental Quality and the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives. AM2713, p. 10, 2. This amendment also provides a new ethanol facility must provide the Department with an analysis of samples of a product no later than July 30, 2004, meeting a specified standard, and provides the minimum rate of production to qualify shall be established for a thirty-day period. Id. Finally, AM2713 adds a new subsection (11) limiting eligibility for incentives under the Employment and Investment Growth Act and the Invest Nebraska Act to ethanol facilities receiving benefits under the Ethanol Development Act that are producing at a rate of fifteen million gallons or more on an annual basis by October 1, 2004. AM2713, p. 11, 4.
Section 5 of AM7164, as does § 13 of AM2644 to LB 1065, amends § 66-1344.01 to provide that the Tax Commissioner shall not accept applications for new agreements on or after the effective date of the act. Section 9 of AM2713, as well as § 17 of AM2644 to LB 1065, amends Neb. Rev. Stat. § 77-4101.01 to include a new subsection providing that Employment and Investment Growth Act incentives are not available to applicants under the Employment and Investment Growth Act for activity which results in benefits under the Ethanol Development Act. Section 10 of AM2713, like § 18 of AM2644 to LB 1065, amends Neb. Rev. Stat. § 77-5536 to provide that Invest Nebraska Act benefits are not available for projects generating incentives under the Invest Nebraska Act for applications submitted after the effective date of the act.
In Op. Att'y Gen. No. 04005 (February 6, 2004), we concluded that LB 479, as amended at that time by AM0852, by "alter[ing] the definition of a `new ethanol facility' eligible for ethanol tax credits under §66-1344(4) to prevent facilities meeting the minimum production rate on the date required under current law from qualifying for credits based on facility expansion after that date, likely create[d] an unconstitutional impairment of contracts between the State and producers that have been executed under existing law." Id. at 9. In light of our earlier opinion, you have asked us to address whether the numerous changes to § 66-1344
and other statutes relating to ethanol development made by LB 479, as amended by AM7164 and AM2713, and LB 1065, as amended by AM2644, also have the effect of unconstitutionally impairing contractual obligations. In addition, you ask whether that portion of AM2713 limiting eligibility for incentives under the Employment and Investment Growth Act and the Invest Nebraska Act to ethanol facilities receiving benefits under the Ethanol Development Act that are producing at a rate of fifteen million gallons or more on an annual basis by October 1, 2004, constitutes prohibited special legislation.
 ANALYSIS A. Delay of Credit Transfers.
Your initial concern is whether the potential delay in transferring motor vehicle fuel tax credits in § 12 of LB 1065 results in an unconstitutional impairment of the State's obligation under agreements between the State and ethanol producers. The credits provided to producers are in the form of "nonrefundable, transferable motor vehicle fuel tax credits." Neb. Rev. Stat. § 66-1344(5) (Cum. Supp. 2002). Section 12 of LB 1065 would add the following new language to Neb. Rev. Stat. § 66-1345(2)(d):
If, during any month, the amount of money in the Ethanol Production Incentive Cash Fund is not sufficient to reimburse the Highway Trust Fund for credits earned pursuant to section 66-1344, the Department of Revenue shall suspend the transfer of credits by ethanol producers until such time as additional funds are available in the Ethanol Production Incentive Cash Fund for transfer to the Highway Trust Fund. Thereafter, the Department of Revenue shall, at the end of each month, allow transfer of accumulated credits earned by each ethanol producer on a prorated basis derived by dividing the amount in the fund by the aggregate amount of accumulated credits earned by all ethanol producers.
Our prior opinion, of course, determined that ethanol production agreements entered into between the State and ethanol producers pursuant to § 66-1345 are contracts creating obligations which the State cannot impair. We have examined representative agreements executed between the State and various ethanol producers, and the agreements provide only that the producer may "begin to apply for credits" upon attaining the minimum level of required production. The agreements are silent with regard to the timing of the transfer of credits.
Further, "'[e]very contract is made with reference to, and subject to, existing law, and every law affecting contracts is read into and becomes a part thereof. This is true between individuals dealing between themselves by contract, express or implied and it is likewise true between individuals and the government.'" Pfeifer v. Abeidinger,166 Neb. 464, 481, 89 N.W.2d 568, 577-78 (1958) (quoting Scotts Bluff County v. State, 133 Neb. 508, 276 N.W. 185, 186 (1937)). Presently, § 66-1345(1) provides that the EPIC Fund "shall be used to pay the credits created under section 66-1344 to the extent provided in this section." Neb. Rev. Stat. § 66-1345(1) (Cum. Supp. 2002). The Department is required, "at the end of each calendar month, to notify the State Treasurer of the amount of motor fuel tax that was not collected in the preceding month due to the credits provided in section 66-1344 . . .," and the State Treasurer then "shall transfer from the [EPIC] Fund to the Highway Trust Fund an amount equal to such credits. . . ." Neb. Rev. Stat. § 66-1344(2) (Cum. Supp. 2002). "For 1998 and each year thereafter, the credits provided in such section shall be funded through the [EPIC] Fund but shall not be funded through either the Highway Cash Fund or the Highway Trust Fund." Neb. Rev. Stat. § 66-1345(2)(d) (Cum. Supp. 2002). Subsection (6) of § 66-1345 requires the Department and the Nebraska Ethanol Board to annually submit a report of anticipated revenues and expenditures from the EPIC Fund "through termination of the ethanol production incentive programs pursuant to section 66-1344." Neb. Rev. Stat. § 66-1344(6) (Cum. Supp. 2002).
Thus, it appears that neither agreements executed between the State and producers nor current statutes address the timing of transfer of ethanol tax credits. Further, § 66-1345 contemplates that credits shall be funded solely by the EPIC Fund, and, while the Legislature is to receive an estimate of EPIC Fund revenues and expenditures, the statute presently does not address what occurs if EPIC Fund revenues are not sufficient to reimburse the Highway Trust Fund. While the State's agreement to provide nonrefundable, transferable motor vehicle fuel tax credits to producers imposes an obligation which the State may not unconstitutionally impair, it is not clear that the suspension or deferral of the transfer of credits proposed under § 12 of LB 1065 impairs this obligation, as no specific time for allowing transfer is provided by the agreements or by statute. To violate the Contracts Clause, any contractual impairment must be "substantial." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 244 (1978). The amendment does not remove the State's obligation to provide credits; at most, it may, should the EPIC Fund be insufficient to reimburse the Highway Trust Fund, result in suspension or deferral of the transfer of credits. This does not mean the credits will not be granted, but that transfer will be delayed. Assuming the delay or suspension is not for an unreasonable period so as to effectively deny a producer's use of credits, the amendment does not, on its face, necessarily establish a substantial impairment of the State's obligation to provide credits under the Act. Our conclusion is dependent upon the reasonableness of any delay in transfer, and we caution that this provision, if adopted, could not be applied in a manner which creates a substantial and excessive delay in allowing transfer due to insufficient funding of credits.
 B. Applying Amendments as of the Effective Date of the Acts Before Agreements are Executed Based on the Existing Statutory Production Deadline.
Section 5 of AM7164 to LB 479, as does § 13 of AM2644 to LB 1065, amends § 66-1344.01 to provide that the Tax Commissioner shall not accept applications for new agreements on or after the effective date of the act. Both bills, as amended, contain an emergency clause making them effective when passed and approved according to law. LB 1065, § 17; LB 479, AM7164, § 10. Should one or both bills pass with the emergency clause prior to the Legislature's adjournment on April 15, 2004, the provision barring the Tax Commissioner from accepting applications for new agreements will go into effect prior to June 30, 2004, the deadline for a facility to meet the minimum production threshold contained in § 66-1344(4)(a) to qualify for ethanol production credits. You ask us whether making the provision precluding the Tax Commissioner from accepting new applications for agreements effective prior to the production deadline would impair potential "implied" contract rights of persons or entities who may have expected to enter into agreements under the Act prior to June 30, 2004, but would be precluded from doing so if the amendments become effective prior to that date.
"There is no vested right in an existing law which precludes its amendment or repeal, and there is no implied promise on the part of the state to protect its citizens against incidental injury caused by changes in the law." Tom and Jerry, Inc. v. Nebraska Liquor Control Comm'n,183 Neb. 410, 160 N.W.2d 232 (1968) (Syllabus of Court). See also Beisner v. Cochran, 138 Neb. 445, 293 N.W. 289 (1949). While "[a] statute may not operate retroactively where it would impair the obligation of a contract or interfere with a vested right . . .," State Board of Educational Lands and Funds v. Haberman, 191 Neb. 127, 129, 214 N.W.2d 266, 268 (1974), enacting a statute which precludes the Tax Commissioner from accepting new applications for credits prior to June 30, 2004, does not constitute a retroactive application of the statute to impair a vested right or contract. If an ethanol producer has not executed an agreement pursuant to § 66-1345, the producer has no contract or vested right which cannot be altered by statute. Accordingly, we do not believe that either of the amendments prohibiting the Tax Commissioner from accepting new applications for agreements on or after the effective date of the act would impermissibly impair contracts or vested rights.
 C. Amendments Relating to Qualification for Credits by "New Ethanol Facilities."
LB 479, as amended by AM7164 and AM2713, includes a number of changes and additions to Neb. Rev. Stat. § 66-1344 relating to "new ethanol facilities." In light of the addition of these provisions relating to the qualification of "new ethanol facilities" to receive credits, which are to take effect upon passage of the legislation with an emergency clause, you ask us to consider if applying these provisions to agreements executed after the act's effective date unconstitutionally impairs potential "implied" contracts with producers that have not yet executed agreements but have until June 30, 2004, to meet the minimum production threshold under existing law.
In Op. Att'y Gen. No. 95043 (May 25, 1995), we noted that new statutory language imposing an additional requirement on ethanol producers in order to qualify for tax credits could not be applied to affect preexisting ethanol production credit agreements. We concluded giving retroactive effect to the statute to impose a new requirement on producers which had previously executed agreements with the State would unconstitutionally impair vested contract rights. Id. at 2. Since the amendment expressed no intent to be applied retroactively, we determined it operated only prospectively, and thus did not affect existing agreements. Id. at 3. See also Op. Att'y Gen. No. 96031 (April 12, 1996) (Amendment imposing additional restriction on ethanol producers to qualify for credits interpreted to apply prospectively so as not to impermissibly impair existing ethanol production credit agreements).
Consistent with our prior opinions, the amendments to § 66-1344
express no intent to operate retroactively so as to affect existing ethanol production credit agreements. Absent an indication that the Legislature intends to apply these provisions retroactively, they would not impact existing agreements or a producer's qualification for credits under agreements entered into under current law.[1]
As we concluded in response to your previous question, we see no constitutional impediment to amending the requirements for qualification of a "new ethanol facility" and making those requirements applicable to agreements entered into after the effective date of the act, even if that is prior to the current June 30, 2004 production deadline. Producers, or potential producers, that have not executed agreements pursuant to §66-1345 have no contract or vested rights which cannot be altered by statute. Thus, while these requirements may have little or no practical effect, in light of the amendment prohibiting the Tax Commissioner from accepting new applications for agreements after the act's effective date, we conclude that applying these additional requirements to agreements executed after the act becomes effective would not impair contracts or vested rights.
 D. Limiting Eligibility for Other Tax Incentives to Producers Achieving a Production Rate of Fifteen Million Gallons or More Annually by October 1, 2004.
AM2713 to LB 479 adds a new subsection (11) limiting eligibility for incentives under the Employment and Investment Growth Act and the Invest Nebraska Act to ethanol facilities receiving benefits under the Ethanol Development Act that are producing at a rate of fifteen million gallons or more on an annual basis by October 1, 2004. AM2713, p. 11, 4. You ask us to address whether this provision creates an impermissible closed class in violation of the prohibition against special legislation in Neb. Const. art. III, § 18.
Art. III, § 18, of the Nebraska Constitution, provides, in pertinent part:
 The Legislature shall not pass local or special laws in any of the following cases, that is to say:
* * *
 Granting to any corporation, association, or individual any special or exclusive privileges, immunity, or franchise whatsoever . . . in all other cases where a general law can be made applicable, no special law shall be enacted.
A legislative act can violate art. III, § 18, if the act (1) creates a totally arbitrary and unreasonable method of classification, or (2) creates a permanently closed class. Bergan Mercy Health System v. Haven, 260 Neb. 846, 620 N.W.2d 339 (2000); MAPCO v. State Bd. of Equal., 238 Neb. 565, 471 N.W.2d 734 (1991); Haman v. Marsh, 237 Neb. at 699, 467 N.W.2d 836 (1991). The issue you have asked us to consider is whether the requirement in AM2713 that ethanol producers receiving benefits under the Act must be producing at the rate of fifteen million gallons annually on or before October 1, 2004, to be eligible for incentives under contracts entered under the Employment and Investment Growth Act or the Invest Nebraska Act, establishes an improper "closed class."
"[A] classification which limits the application of the law to a present condition, and leaves no room or opportunity for an increase in the numbers of the class by future growth or development, is special, and a violation of [the special legislation clause]. . . ." City of Scottsbluff v. Tiemann, 185 Neb. 256, 262, 175 N.W.2d 74, 79 (1970) (quoting State v. Kelso, 92 Neb. 628, 139 N.W. 226 (1912)). "In determining whether a class is closed, [a court] is not limited to the face of the legislation, but may consider the act's application." Haman v. Marsh, 237 Neb. at 717, 467 N.W.2d at 849. "In deciding whether a statute legitimately classifies, [a] court must consider the actual probability that others will come under the act's operation. Id. at 717-18, 467 N.W.2d at 849. "If the prospect is merely theoretical, and not probable, the act is special legislation." Id. at 718,467 N.W.2d at 849. "The conditions of entry into the class must not only be possible, but reasonably probable of attainment." Id.
The issue of whether application of this provision creates an improper closed class depends on whether only an identifiable number of ethanol producers could, in actual probability, meet the fifteen million gallon requirement by October 1, 2004. The mere possibility that more than a predetermined number of producers may satisfy this requirement is not sufficient to avoid a finding that a closed class exists. We are not in a position to assess this potential, as it involves evaluating facts not provided for our analysis. Our advice is limited to stating that this is the legal standard which must be satisfied in order to meet any constitutional challenge to this provision if it is attacked as creating an impermissible closed classification.
 CONCLUSION
In sum, we conclude that the potential delay in credit transfers proposed under § 12 of LB 1065 likely does not impair existing contracts with ethanol producers. Nothing in these agreements or current statutes address the timing of credit transfers, and this provision, unless applied in an unreasonable manner which effectively negates the State's obligation to provide required credits, would not impermissibly impair the State's obligation to producers under existing agreements. Also, the amendments prohibiting the Tax Commissioner from accepting new applications for agreements on or after the effective date of the act do not impermissibly impair contracts or vested rights, as no such rights exist prior to execution of an agreement. We further conclude that applying the various other amendments to LB 479 and LB 1065 as of the effective date of these acts if passed with emergency clauses, making them effective prior to the existing June 30, 2004, statutory deadline for ethanol tax credit qualification, does not violate any vested or contractual rights of persons that have not yet executed agreements with the State. There is no indication that the Legislature intends any of these amendments to apply retroactively to affect existing contracts, and, absent such intent, the changes are only prospective. Finally, the amendment limiting eligibility for incentives under the Employment and Investment Growth Act and the Invest Nebraska Act to ethanol facilities receiving benefits under the Ethanol Development Act that are producing at a rate of fifteen million gallons or more on an annual basis by October 1, 2004, potentially creates a closed classification in violation of Neb. Const. art. III, § 18. We have attempted to provide guidance by setting forth the standard for assessing whether adoption of the amendment may create a closed class.
Sincerely,
 JON BRUNING Attorney General
 L. Jay Bartel Assistant Attorney General
Approved:
____________________________ Attorney General
pc: Patrick O'Donnell Clerk of the Legislature
[1] Some of the changes to § 66-1344 proposed by the amendments are regulatory in nature and relate to procedural matters governing the Department's administration of the ethanol credit program including: (1) Requiring that ethanol production is to be measured by a device approved by the Division of Weights and Measures of the Department of Agriculture; (2) Limiting claims for credits to within three years of the date ethanol is produced or by September 30, 2012, whichever occurs first; (3) Establishing record-keeping requirements for ethanol producers; (4) Applying motor vehicle fuel tax administrative criteria to excess credit and deficiency determinations; and (5) Providing a grievance process for Department determinations relating to ethanol credits. These procedural requirements would apply to all ethanol producers, even those which have executed agreements, as they do not modify or impair any contractual rights.